| | | |
|---|---|---|
| WEBER-STEPHEN PRODUCTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:13-cv-01686 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| SEARS HOLDING CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Weber-Stephen Products LLC brought this suit against Defendant Sears Holding Corporation, alleging patent infringement, in violation of 35 U.S.C. § 271, and trade dress infringement, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). R. 1, Compl. Sears filed a number of counterclaims alleging, among other things, that the patent at issue (known as the '874 patent) is invalid and unenforceable because of Weber's inequitable conduct, that Weber engaged in anticompetitive acts in violation of state and federal antitrust laws, and that Weber breached its contract with Sears, Roebuck and Company. R. 36, Sears Answer. Weber has moved to dismiss the inequitable conduct and antitrust claims under Federal Rule of Civil Procedure 12(b)(6). R. 43, Mot. Dismiss. Weber also seeks to strike Sears's inequitable conduct affirmative defense. *Id.* For the reasons below, the motion is granted in part and denied in part.[1]

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a)-(b), 2201, 2202, 1367(a). Citation to this Court's docket is noted as "R. [docket entry number]."

# I. Background

Weber is a leading worldwide designer and manufacturer of outdoor gas, charcoal, and electric grills and grilling accessories, including the Weber Genesis line of grills. Compl. ¶ 3. Weber's and Sears's relationship ("Sears" in this opinion refers to the named defendant, the holding corporation entity) began in 1998, when Weber agreed to supply merchandise to Sears's subsidiary Sears, Roebuck and Company. R. 36, Answer at 20. In connection with sales of Weber grills, the agreement also authorized Sears to offer service contracts, by which Sears Roebuck would replace or repair Weber grills and parts for up to five years after purchase. *Id.*

In 2012, Weber notified Sears Roebuck that it intended to cease the parties' business dealings. *Id.* Weber would permit Sears Roebuck to retain and sell the balance of its inventory on hand, but would not supply new inventory of grills or accessories. *Id.* at 20-21. Weber stated it was terminating the business relationship because Sears was not dedicating enough resources to the Weber brand. *Id.* at 21. Weber also claimed Sears was using Weber products to lure consumers into Sears's stores and then selling them Sears's own Kenmore-brand products. *Id.* Sears notes that Weber's announcement came on the heels of Sears's initial efforts to develop a competing grill under its Kenmore Elite brand. *Id.* Sears's competing grill also gave rise to the underlying patent and trade dress infringement claims in this case. Compl. ¶¶ 25, 36, 47, 69.

Weber owns United States Patent No. 8,347,874 B2 (entitled "Grease Drip Pan and Gas Tank Blocker for a Barbecue Grill"). Answer ¶ 4. The '874 patent discloses a fuel-tank-blocking structure that prevents storage of a second fuel tank inside a grill frame to minimize fire and tipping hazards in gas barbecue grills. R. 14-1, Exh. A, '874 Patent at 2. To discourage removal of the tank blocker (removal would undermine the safety feature), the '874 patent describes the preferred embodiment as one "adapted to support a component of the grease management system, namely the grease drip pan." *Id.* Thus, consumers would not be able to remove the tank blocker without impairing the grease-management system. *Id.* Weber has alleged that Sears's Kenmore Elite Stainless grill and Kenmore Elite Espresso grill infringe the '874 patent by also featuring propane-tank blocking structures and grease-collecting cup brackets. Compl. ¶¶ 16, 20-23.

In its answer, Sears alleges that the '874 patent is unenforceable because Weber intentionally did not disclose relevant prior art to the Patent & Trademark Office (PTO for short) in connection with the '874 patent application. Answer at 23-33. Relatedly, Sears asserts inequitable conduct as an affirmative defense and a counterclaim to Weber's allegations of patent infringement. *Id.* at 15, 34 (Affirmative Defense No. 8; Counterclaim No. 3). Sears also asserts that Weber's fraudulent procurement of a patent and discontinuation of dealings with Sears constitute unlawful monopolization and attempted monopolization in violation of the Sherman Antitrust Act and its Illinois state-law equivalent. *Id.* at 37-40

(Counterclaims Nos. 8-12). Weber now moves to dismiss these counterclaims and to strike the inequitable conduct affirmative defense.

## II. Standard of Review

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

Ordinarily, under Federal Rule of Civil Procedure 8(a)(2), a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But claims alleging fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Rule 9(b)'s heightened pleading standard applies to claims of inequitable conduct. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326

(Fed. Cir. 2009); *see also id.* at 1318 ("Whether inequitable conduct has been pleaded with particularity under Rule 9(b) is a question governed by Federal Circuit law."). Thus, Rule 9(b) requires that Sears's allegations of inequitable conduct state "the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Id.* at 1327. Sears's antitrust claims are analyzed under the less demanding Rule 8(a)(2) standard.

## III. Analysis

In its motion to dismiss, R. 43, Weber contends Sears has not pleaded inequitable conduct with sufficient particularity. Mot. Dismiss at 10. On Sears's monopoly and attempted monopoly counterclaims, Weber argues Sears has not adequately alleged that Weber holds monopoly power or engaged in anticompetitive acts to further such power. *Id.* at 20-21. Each issue is addressed in turn below.

## A. Inequitable Conduct

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). A claim of inequitable conduct requires a party to show "that information material to patentability was withheld from the PTO . . . with the intent to deceive or mislead the patent examiner into granting the patent." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012). Inequitable conduct thus requires a showing of both (1) materiality and (2) intent to deceive. *Therasense*, 649 F.3d at 1287. The Federal Circuit recently "tighten[ed] the standards for finding both intent and materiality."

*Id.* at 1290. To prevail on a claim of inequitable conduct, an accused infringer must now prove (1) but-for materiality—that is, that "the PTO would not have allowed a claim had it been aware of the undisclosed prior art" and (2) "that the patentee acted with the specific intent to deceive the PTO." *Id.* at 1290-91.

Sears alleges that Weber engaged in inequitable conduct because the individuals responsible for prosecuting the '874 patent intentionally did not disclose prior art to the PTO which would have affected the purported invention's patentability. Answer at 15, 34. Two patent applications are relevant to Sears's claim: the '874 patent (the tank-blocker patent described above) and the '071 patent application (a since-abandoned application disclosing a caster with a forwardly projecting kickstand to prevent a grill from tipping over). Answer at 25. Both applications were filed on behalf of Weber by inventor Adrian Bruno and attorneys David Roche and Daniel Tallitsch. *Id.*

The '071 application was filed around November 30, 2006. *Id.* at 36. With it, Bruno, Roche, and Tallitsch submitted the American National Standards Institute, Inc.[2] 2005 standards for outdoor cooking gas appliances (ANSI 2005). *Id.* at 26. ANSI 2005 Standard 1.3.7 states, "[a]n outdoor cooking gas appliance shall be constructed so it cannot be tipped by any reasonable pressure." *Id.* at 26 (quoting from the ANSI standards). On the same page, a few lines below Standard 1.3.7, is Standard 1.3.10, which says that outdoor grills should be designed to prevent storage of a spare tank:

---

[2]ANSI is a nationally recognized coordinator of voluntary standards development in the United States through which organizations establish and improve national consensus standards. Answer at 23.

Outdoor cooking gas appliances for connection to a self-contained liquefied petroleum gas supply system shall be designated for the storage of only the cylinder currently in use. They shall be designed so a spare 20 lb (9.1 kg) or 30 lb (13.6 kg) LP-gas cylinder cannot be stored within any enclosure, or under the firebox of the appliance.

*Id.* Sears suggests that Standard 1.3.10 relates to the '874 patent application in the same way that Standard 1.3.7 related to the '071 patent application—that is, both patents disclose a mechanism for complying with an industry mandate. Despite this similarity, Sears alleges, Weber's prosecution team of Bruno, Roche, and Tallitsch submitted no prior art in connection with the '874 patent application, which was filed just four months after the '071 application (for which they did disclose an ANSI standard). This omission forms the basis of Sears's inequitable conduct counterclaim and affirmative defense.

Weber seeks dismissal of Sears's counterclaim by arguing that Sears has failed to plead inequitable conduct (1) under the heightened *Therasense* standard and (2) with the particularity required by Rule 9(b). R. 43-1, Weber Br. at 10. In a post-*Therasense* opinion, the Federal Circuit held that to survive a motion to dismiss a complaint must "recite[] facts from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with the specific intent to deceive the PTO." *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011) (citing *Exergen v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318, 1330 (Fed. Cir. 2009); *accord Waters Indus., Inc. v. JJI Int'l, Inc.*, No. 11 C 3791, 2012 WL 5966534 at *4 (N.D. Ill. Nov. 28, 2012) ("*Therasense* did not address inequitable

conduct claims at the pleading stage nor did it override *Exergen*'s pleading requirements.").[3] Sears's allegations must also meet the heightened pleading requirement of Rule 9(b), which requires a party to "identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1328. In other words, an allegation of inequitable conduct must "name the specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it"; identify "which claims, and which limitations in those claims, the withheld references are relevant to"; "where in those references the material information is found"; "'why'" the withheld information is material and not cumulative"; and "'how'" an examiner would have used this information in assessing the patentability of the claims." *Id.* at 1329-30.

Sears has met this standard. As discussed above, Sears has identified three specific individuals associated with the prosecution of the '874 patent whom a jury could reasonably conclude (based on the facts alleged in the affirmative defense and counterclaim) knew of the ANSI 2005 standard and intentionally withheld it from the PTO. The same three individuals filed both the '874 patent application and the '071 patent application. *Id.* at 24-25. The '071 application predated the '874 application by just four months and disclosed ANSI 2005 as prior art. *Id.* Standards

---

[3]Citing *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 803 F. Supp.2d 409, 432 (E.D. Va. 2011), Weber argues *Therasense* added a third requirement at the pleading stage: that "a party must make an initial showing from which it may be plausibly inferred that . . . the intent to deceive is the single most likely explanation for the non-disclosure." Weber Br. at 11. The Federal Circuit's post-*Therasense* holding in *Delano* refutes this suggestion and controls here. *See* 655 F.3d at 1350. The "single most likely explanation" standard is an evidentiary one, reserved for the merits.

1.3.7 and 1.3.10 appeared on the same page of ANSI 2005, just a few lines apart. *Id.* at 26. And, even independent of the '071 patent, it is reasonable to infer that Weber's grill designer would be aware of relevant industry standards—especially where Weber deemed ANSI important enough to appoint its own representative to participate in the development of ANSI 2005.[4] *Id.* at 24. Sears thus has sufficiently pled "who" it was that allegedly engaged in inequitable conduct by withholding known prior art.

For the "what" and "where" of Weber's alleged inequitable conduct, Sears identified ANSI 2005 Standard 1.3.10 as the place where the prior art is found,[5] *id.* at 25-26, and Sears specifically identified Claims 9 and 13 of the '874 patent as the claims to which standard 1.3.10 is relevant. *Id.* at 31-33. With respect to Standard 1.3.10, Weber argues that Sears identified the wrong ANSI reference because at the time the '071 and '874 patents were filed, ANSI Z21.58-2006 (ANSI 2006) was in effect. Weber Br. at 13-14. Weber contends "[t]his distinction is critical, and fatal, to

[4]Weber argues that its representative for ANSI 2005, Christopher Childers, cannot be the "who" for the inequitable conduct claim because he was not associated with the filing or prosecution of the '874 patent. Weber Br. at 12. That argument misses the mark because Sears already clearly identifies three other individuals who participated in the filing of the '071 and '874 applications. Sears offers Childers merely as an additional link between Weber and the ANSI Standards.

[5]Weber argues that merely being aware of a reference in connection with other applications is not enough because "'[a] reference may be many pages long, and its various teachings may be relevant to different applications for different reasons. Thus, one cannot assume that an individual, who generally knew that a reference existed, also knew of the specific material information contained in that reference.'" Weber Br. at 13 (quoting *Exergen*, 575 F.3d at 1330). Other than this bald quotation, however, Weber does not refute that it is reasonable to infer (at this dismissal-motion stage, the evidence is viewed in Sears's favor) that Weber was aware of ANSI 2005 Standard 1.3.10. Given the same-page proximity of Standards 1.3.7 and 1.3.10 and the centrality of ANSI standards to the outdoor grill market, the Court may reasonably infer that Bruno, Roche, and Tallitsch knew of the allegedly material information contained in Standard 1.3.10.

the adequacy of [Sears's] allegations because ANSI [2006] does not contain Section 1.3.10—i.e., the information [Sears] alleges to be material to the '874 patent." *Id.* There are several problems with this argument. Under Federal Rule of Civil Procedure 12(d), Weber's presentation of materials outside the pleadings is probably improper and cannot be considered at all. And even if one were to assume that ANSI 2006 supplanted ANSI 2005 on the tank-blocking Standard, Sears correctly asserts that prior art is prior art. R. 48, Sears Br. at 11. Regardless which standard was in effect when the '874 patent was filed, an earlier reference constitutes prior art (or at least at this stage of the litigation, Sears is entitled to the benefit of the doubt). Moreover, it appears even on the face of ANSI 2006 that it is a *supplement* to ANSI 2005, not a substitute for it. ANSI 2006 is clearly labeled "Addenda to [ANSI 2005]," superseding only the corresponding standards in ANSI 2005. R. 43-2, Mot. Dismiss, Exh. 1 at 4. Sears has, therefore, pled the "what" and "where" of inequitable conduct with sufficient particularity. *Exergen*, 575 F.3d at 1329. "When" corresponds to the time period between the March 2006 filing date of the '874 patent application and its 2013 issuance.

This leaves only "why" ANSI 2005 Standard 1.3.10 was material and "how" the standard would have affected the patentability of Weber's tank-blocking structure. *See id.* In its complaint, Sears identifies a number of Office Actions by the PTO and responses by Weber during the six-year pendency of the '874 application. In an Office Action dated January 2009, the PTO rejected claims of the '874 patent in light of another patent disclosing "a barbecue grill assembly" having a design

"such that only one fuel tank [] can be disposed on the barbecue grill assembly."
Answer at 26. Weber attempted to distinguish the '874 patent by arguing that its
frame assembly was "capable of receiving two standard 20 lb fuel tanks, and with
the tank blocking structure, [would be] capable of receiving only a single standard
20 lb fuel tank." *Id.* at 26-27. The PTO again rejected the '874 application in October
2009 in light of another patent (the "Giebel" patent) disclosing a barbecue grill
capable of receiving two standard tanks, but also having a tank-blocking structure
such that only one tank could be stored within. *Id.* at 27. Weber argued the Giebel
patent merely precluded *vertical* storage of a second tank, whereas the '874 tank
blocker would preclude *any* storage of a second tank. *Id.* at 27-28. In response to a
later rejection based on the same Giebel patent, Weber also argued the '874 patent
was distinguishable because it specified the size of the contemplated tanks (20 lbs).
*Id.* at 29. At no time during this correspondence did Weber disclose ANSI 2005 to
the PTO. Sears alleges that disclosure of ANSI 2005 Standard 1.3.10 would have
refuted each of Weber's responses to the PTO and would have rendered obvious the
claimed invention, because ANSI 2005 prohibits storage of a spare 20-lb tank in any
orientation.

Ultimately, the PTO allowed some claims of the '874 patent because the
examiner concluded the following combination of elements was not disclosed by the
prior art: (1) that only one of the two fuel tanks can be disposed in the frame
assembly; (2) the frame assembly has a volume capable of housing both fuel tanks
except for the tank-blocking structure; (3) the tank-blocking structure is spaced

apart from and positioned below the cooking chamber and is not suspended from the cooking chamber; and (4) the tank-blocking structure holds a grease drip pan for collecting grease from the cooking chamber of the barbecue grill assembly. *Id.* at 30. Sears alleges element (1) would have been disclosed by ANSI 2005, and elements (2) and (3) were disclosed by the Giebel patent. *Id.* at 31. This leaves only element (4)— the grease drip pan—to distinguish the '874 patent from the prior art. Because Claims 9 and 13 of the '874 patent do not recite a grease drip pan, Sears concludes those claims would not have issued but for Weber's failure to disclose ANSI 2005. *Id.* Viewed in the light most favorable to Sears, Sears is correct: ANSI 2005 and the Giebel patent would render obvious Claims 9 and 13. Sears has thus adequately pled the "why" and "how" of Weber's inequitable conduct. *See Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374-75 (Fed. Cir. 2005) ("[A] finding of inequitable conduct in the acquisition of even a single claim of a patent renders the remaining claims of that patent unenforceable, even those without the taint of inequitable conduct.").

Weber argues the back-and-forth correspondence described above did not relate to Claims 9 and 13 of the '874 patent, rendering Sears's "what" allegations inadequate. Weber Br. at 14. Sears does not, however, rest its allegations of inequitable conduct on that correspondence; rather, the correspondence provides context for Sears's argument that ANSI 2005 coupled with the Giebel patent would have rendered Claims 9 and 13 obvious. The correspondence also illustrates the ongoing relevance and materiality of ANSI 2005 to the prosecution of the '874

patent as a whole, strengthening a reasonable inference of deceptive intent underlying Weber's six-year nondisclosure. From the very start of the application process (the initial filing date of the application), it is reasonable to conclude that there was no discernible reason for Weber to disclose ANSI 2005 with the '071 application and yet not to disclose another Standard in ANSI 2005 with the '874 application. Indeed, Sears's complaint alleges that Weber submitted *no prior art whatsoever* in connection with the '874 patent application, though the PTO itself later identified a number of relevant references. Answer at 25. Under the circumstances, a jury could reasonably infer that Bruno, Roche, and Tallitsch appreciated the material nature of ANSI 2005 and decided not to disclose it to the PTO with deceptive intent. Accordingly, Weber's motions to dismiss Counterclaim 3 and to strike Sears's Affirmative Defense No. 8 are denied.

## B. Antitrust

Weber also seeks dismissal of Sears's antitrust counterclaims. Sears alleges Weber engaged in unlawful monopolization and attempted monopolization in violation of section 2 of the Sherman Antitrust Act (Counterclaims 8 and 9) and the Illinois Antitrust Act (Counterclaims 11 and 12). Answer at 37-40. Sears bases its counterclaims on Weber's termination of dealings with Sears Roebuck and on Weber's fraudulent procurement of a patent based on inequitable conduct (Counterclaim 10) as described above. *Id.* Weber makes only one argument against Counterclaim 10: it should be dismissed for the same reasons that supposedly require dismissal of Sears's inequitable conduct counterclaim. Weber Br. at 17.

Because (as discussed above) Sears has sufficiently pled its inequitable conduct counterclaim, and Weber offers no other reasons to dismiss Counterclaim 10, Weber's motion to dismiss is denied with respect to Counterclaim 10. Weber contends that Sears's remaining antitrust counterclaims, for monopolization and attempted monopolization, should be dismissed because they are insufficiently pled and amount to nothing more than a breach-of-contract claim.

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The related offense of attempted monopolization under the Sherman Act similarly requires "proof of a dangerous probability that [an entity] would monopolize a particular market and specific intent to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). Sears's monopolization and attempted monopolization counterclaims can be analyzed using the same principles under the Sherman Act and its Illinois state-law equivalent. *See E-One v. Oshkosh Truck Corp.*, No. 06 CV 1391, 2006 WL 3320441, at *2 (N.D. Ill. Nov. 13, 2006) ("Because § 3(3) of the Illinois Antitrust Act was modeled upon § 2 of the Sherman Act, Illinois courts apply federal antitrust law to resolve questions arising under the state statutory provision.").

Weber argues Sears has not sufficiently pled the first element of an antitrust claim: that Weber held monopoly power over the relevant market or a dangerous probability of obtaining it. *See Grinnell*, 384 U.S. at 570-71 (elements of monopolization claim); *Spectrum Sports*, 506 U.S. at 459 (elements of attempted monopolization claim). In particular, Weber contends Sears "neither identified a plausible relevant market nor demonstrated that Weber has power in that market." Weber Br. at 21 n. 6.

Sears alleges that the market for outdoor gas grills can be divided into three segments: (1) basic grills under $500, (2) premium grills between $500 and $2,000, and (3) specialty grills over $2,000. Answer at 18-19. It characterizes Weber Genesis grills as premium grills and estimates Weber's United States market share exceeds 70%. *Id.* at 19. Weber contends this classification is arbitrary and "gerrymandered to give Weber a purported 70% share." Weber Br. at 20-21. Because Sears's factual allegations are accepted as true, *Erickson*, 551 U.S. at 94, and "market definition is a deeply fact-intensive inquiry," *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litigation*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2nd Cir. 2001)), the Court holds that Sears has adequately pled a relevant market.

Sears's allegations of Weber's monopoly power are less persuasive, but ultimately say enough to satisfy the governing standard. "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). There are two accepted methods for

proving that a defendant possessed monopoly power: (1) "through direct evidence of anticompetitive effects"; or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice." *Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000). "[W]here plaintiffs fail to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly, their § 2 claim may be properly dismissed." *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

Sears offers only one factual assertion in support of its allegation that Weber possesses monopoly power: that Weber possesses a 70% share of the market. Answer at 19. Generally, "[monopoly] power ordinarily may be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571. But relying on this one factual assertion comes close to falling short, because a dominant market share does not conclusively establish monopoly power. *See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986). For example, in a market with low barriers to entry, the Seventh Circuit has held that "existing market share does not signify power." *Id.* at 1335. Invoking this principle, Weber argues that Sears has identified no barriers to entry in the relevant market. Weber Br. at 21 n. 6. That is true enough. But that single sentence, Weber Br. at 21 n.6, comprises Weber's entire challenge to a finding of monopoly power. In light of this cursory treatment by Weber and the general principle that monopoly power

ordinarily may be inferred from a predominant market share, the Court concludes that Sears has adequately pled monopoly power.

Even so, Sears has not alleged sufficient facts to meet the second requirement under section 2 of the Sherman Act: anti-competitive behavior or abuse of market power. *See Endsley*, 230 F.3d at 283. The crux of Sears's antitrust counterclaims is Weber's withdrawal of its products from Sears Roebuck's stores and website. The facts, as alleged by Sears, fall squarely within the Supreme Court's "refusal to deal" case law. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-11 (2004) (1985). Those cases make clear that "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Linkline*, 555 U.S. at 448. The Supreme Court has, however, recognized limited circumstances in which a firm's unilateral refusal to deal with a competitor can constitute an antitrust violation. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985).

The leading case for section 2 liability based on a refusal to deal is *Aspen Skiing*. There, a single entity owned three of the four mountain ski facilities in Aspen and, for years, cooperated with the owner of the fourth to issue a joint ski ticket to visitors, who could use the joint ticket to ski at all four facilities. *Id.* at 589. When the three-facility owner canceled the joint ticket to offer its own three-mountain pass, the one-facility owner tried a number of ways to reinstate the joint ticket—including offering to buy the three-facility owner's tickets at retail price so

that it could offer those tickets to its visitors along with its own ski pass. *Id.* at 593. But the three-facility owner refused to sell even retail-priced tickets to the other owner. *Id.* Not surprisingly, the one-facility owner's market share steadily declined. *Id.* at 594-95. In these specific circumstances, the Supreme Court upheld antitrust liability against the three-facility owner, holding that "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Id.* at 601. The monopolist ski-facility owner refused to deal with the other facility for the very purpose of maintaining the monopoly. *Id.* at 609-10.

In light of the unusual circumstances presented by *Aspen Skiing*, the Seventh Circuit has recognized that *Aspen*-like circumstances are a rare exception. *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("If [*Aspen*] stands for any principle that goes beyond its unusual facts, it is that a monopolist may be guilty of monopolization if it refuses to cooperate with a competitor in circumstances where some cooperation is indispensable to effective competition."). Yet Sears argues this case is analogous to *Aspen Skiing*, and Weber's allegedly anticompetitive conduct should give rise to antitrust liability. But Sears's own brief undermines its argument: at the close of its *Aspen Skiing* summary, Sears writes "[t]he Supreme Court noted that defendant's actions were followed by evidence of market contraction and adverse impact on consumers." Sears Br. at 21. These are precisely the elements missing from Sears's account here. The monopolist's actions in *Aspen Skiing*—withdrawing the superior four-mountain ticket from the market entirely—effectively eliminated the one-facility owner's

ability to compete. *See* 472 U.S. at 606-08. In contrast, here no product has been withdrawn from the market; consumers retain ample access to Weber's products via its numerous non-Sears retailers.[6] And, as both a retailer of grills and a competitor of Weber's, Sears retains its ability to compete in the premium grill market by offering third-party competing grills and by developing and selling its own competing grills. Sears's *conclusory* allegations that Weber's conduct "has caused harm to competition," "restrict[s] output," and is "likely to cause consumers to pay higher prices" are wholly unsupported by *factual* assertions. Answer at 22; *see Funteas v. BP Products North Am., Inc.*, No. 03-C-7624, 2005 WL 736226, at *3 (N.D. Ill. Mar. 30, 2005) ("[T]he facts alleged in the complaint do not support the proposition that Defendants' actions constitute a 'restraint.' Defendants did not keep Plaintiff from operating a gas station: they only refused to let him run a BP gas station.").

Sears adds that Weber's refusal to sell replacement parts to Sears directly caused Sears to have to find other, more expensive sources for those parts to fulfill its outstanding repair contracts. Sears Br. at 21. This argument does not advance Sears's antitrust claims; as a result of Weber's refusal-to-sell, Sears's access to Weber products is identical to any other consumer's access—that is, Sears can purchase parts at any other retail location at market price. This, too, serves to distinguish Sears's case from *Aspen Skiing*, in which the one-facility owner was denied all access to competing passes, even at retail price. "[A]ntitrust law does not

---

[6]For example, a prospective grill purchaser would find 24 retailers of the Weber Genesis E-Series in the Chicago area alone through Weber's "Find a Dealer" function at http://dealer.weber.com.

require monopolists to cooperate with rivals by selling them products that would help the rivals to compete." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006).

Finally, Sears argues that Weber's business justifications for terminating the parties' relationship (lack of resources dedicated to the Weber brand, bait-and-switch sales tactics, and drab appearance of Sears stores) were pretextual. Sears Br. at 22. Even if this were true, only "willful acquisition or maintenance of [monopoly] power," *Grinnell*, 384 U.S. at 570-71, or a "specific intent to monopolize," *Spectrum Sports,* 506 U.S. at 459, would render Weber's true motivations relevant to an antitrust claim. Sears has adequately alleged neither; at best, its allegations suggest Weber terminated the parties' agreement because it did not want to grant a competitor (and perceived patent infringer) access to Weber's products. Absent the requisite factual allegations of intent, Sears's allegations boil down to a mere contract dispute. *See Norville v. Globe Oil & Refining Co.*, 303 F.2d 281, 282 (7th Cir. 1962) ("[T]he use of conventional antitrust language in drafting a complaint will not extend the reach of the Sherman Act to wrongs not germane to that act." (internal citation omitted)). Accordingly, Sears has failed to plead the second element of a Sherman Act violation for monopolization or attempted monopolization. Sears's Counterclaims 8, 9, 11, and 12 are dismissed.

### C. Breach of Contract

Weber originally sought dismissal of Counterclaim 13 (for breach of contract), arguing that Sears Holdings Corporation lacked standing to sue for a breach of the agreement between Weber and the subsidiary, Sears Roebuck. Weber Br. at 24.

Relatedly, Weber argued that the Court lacked subject matter jurisdiction over this state-law counterclaim. *Id.* Weber has since withdrawn its jurisdictional objections and correctly conceded that the Court has supplemental jurisdiction, 28 U.S.C. § 1367, over Sears Holdings's breach-of-contract counterclaim (during this discussion, it makes sense to use "Sears Holdings" to label the currently named defendant). R. 107, Weber Contract Br. at 2. This concession does not, however, resolve the question as to whether Sears Holdings is the "real party in interest" on that counterclaim. *See* Fed. R. Civ. P. 17(a)(1).

For its part, Sears Holdings has proposed substituting Sears Roebuck as the real party in interest on *all* claims and counterclaims. R. 77, Sears Reply at 6. Weber argues that Sears Holdings does have liability and is correctly named as a defendant, in part because Sears Holdings executives allegedly made operational decisions, relevant to the claims in the case, for Sears Roebuck. So Weber does not believe that Sears Holdings should be removed from the suit, but rather that Sears Roebuck should be added to the lawsuit.[7]

Based on Sears Roebuck's role in the factual allegations underlying both Weber's claims and Sears Holding's counterclaims, joining Sears Roebuck into this suit is proper. Thus far, Sears Roebuck and Sears Holdings have been referred to

---

[7]Weber also argues for the first time that Kmart Holding Corporation and Kmart Corporation—neither of whom have ever before been discussed in this case—should be added to the lawsuit. Weber Contract Br. at 3. That request cannot be made in a brief: "It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012) (internal citation omitted). If Weber wishes to join Kmart as a party to this lawsuit, it must do so in a formal motion; a glancing reference to a previously unmentioned party will not suffice.

almost interchangeably in the parties' briefs. And it is undisputed that Sears Roebuck is an actual party to the contract at issue in the counterclaim. Accordingly, Sears Roebuck will be added to this lawsuit as if it had originally been named as a defendant in the complaint and named as a plaintiff in Sears's counterclaims. The Clerk of the Court is directed to add Sears, Roebuck and Company to the docket as a named defendant and as a counter-claimant. Unless Sears Holdings's lawyer says otherwise, the Court will treat all pleadings as having also been served on (if pled by Weber) or made by (if pled by Sears Holding) Sears Roebuck, so there is no need for a separate answer or counterclaim. The Court also presumes that defense counsel will enter an appearance for Sears Roebuck.

At this time, Sears Holdings will remain a party to the lawsuit. If Sears Holdings wishes to be removed from the case, it can try to file a Rule 12(b)(6) motion or, more likely, a later motion for summary judgment specific to its liability apart from Sears Roebuck.

## IV. Conclusion

For the reasons stated above, the Court denies Weber's motion to dismiss [R. 43] Counterclaims 3 and 10, arising from Weber's alleged inequitable conduct. For the same reasons, the Court denies Weber's motion to strike Sears's Affirmative Defense Number 8. The Court grants Weber's motion to dismiss Counterclaims 8, 9, 11, and 12. Finally, the Court orders joinder of Sears, Roebuck and Company to this lawsuit.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: February 20, 2014