| | | |
|---|---|---|
| WEBER-STEPHEN PRODUCTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:13-cv-01686 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| SEARS HOLDING CORPORATION, and | ) | |
| SEARS, ROEBUCK AND CO., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Weber-Stephen Products LLC brought this suit against Defendants Sears Holding Corporation and Sears, Roebuck and Co. (collectively referred to as Sears), alleging patent infringement, in violation of 35 U.S.C. § 271, and trade dress infringement, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). R. 138, First Am. Compl. Weber contends that Sears manufactures and sells products that infringe one of Weber's utility patents and two of its design patents, namely, United States patent numbers 8,347,874 (the '874 utility patent), D564,834 (the '834 design patent), and D609,045 (the '045 design patent). *Id.* Specifically, Weber contends that Sears has infringed claims 1-4, 6-10, and 14-20 of the '874 patent and certain elements of the '045 and '834 design patents. *Id.* ¶¶ 28, 39, 50. The parties briefed the construction of disputed terms in the claims at issue, and the Court held

a claim construction hearing, comprised of oral argument. The Court decides the construction of disputed terms as set forth below.[1]

## I. Background

The '874 patent (entitled "Grease Drip Pan and Gas Tank Blocker for a Barbecue Grill") discloses a fuel-tank-blocking structure that prevents storage of a second fuel tank inside a grill frame to minimize fire and tipping hazards in gas barbecue grills. R. 175-1, J.A., '874 Patent at 1. To discourage removal of the tank blocker (removal would of course defeat the safety feature), the '874 patent describes the preferred embodiment of the invention as one "adapted to support a component of the grease management system, namely the grease drip pan." *Id.* Thus, consumers would not be able to remove the tank blocker without impairing the grease-management system. *Id.* Weber alleges that Sears's Kenmore Elite Stainless grill and Kenmore Elite Espresso grill infringe Claims 1-4, 6-10, and 14-20 of the '874 patent by also featuring propane-tank blocking structures and grease-collecting cup brackets. First Am. Compl. ¶¶ 23-28.

In the '874 patent, the parties have identified three disputed terms for construction. Independent Claims 1 and 14 provide examples of the disputed terms (in ***bold italics*** below) in context. From Claim 1:

1. A barbecue grill assembly comprising:

a cooking chamber, a frame assembly, and a ***tank blocking structure***;

the frame assembly supporting the cooking chamber;

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a)-(b), 2201, 2202, 1367(a). Citation to this Court's docket is noted as "R. [docket entry number]."

the frame assembly having an interior with a volume capable of receiving ***two fuel tanks of equal size***, except that the tank blocking structure divides the interior of the frame assembly to create a plurality of compartments, such that only one of the two fuel tanks can be disposed in the frame assembly; and,

the tank blocking structure holding a grease drip pan for collecting grease from the cooking chamber of the barbecue grill assembly, wherein the tank blocking structure is spaced apart from and positioned below the cooking chamber and is not suspended from the cooking chamber.

J.A. at 9. And from Claim 14:

14. A barbecue grill assembly comprising:

a cooking chamber, a frame assembly, a grease drip tray, a grease drip pan, a tank blocking structure, and a first fuel tank;

the frame assembly having an interior defined by a top, a bottom panel, a rear panel, a right side panel, a left side panel, and a front;

the frame assembly having at least one door at the front of the frame assembly;

the cooking chamber being supported by the frame assembly at the top of the frame assembly;

the grease drip tray being disposed below the cooking chamber and having an opening for directing grease into the grease drip pan;

the first fuel tank being disposed in the interior of the frame assembly;

the tank blocking structure being mounted in the interior of the frame assembly and being adapted to support the grease drip pan below the opening of the grease drip tray and to ***prevent a second fuel tank***, of a size equal to that of the first fuel tank, ***from being disposed at the interior of the frame assembly***; and

wherein the frame assembly has a volume capable of housing both the fuel tank and replacement fuel tank except for the tank blocking structure.

3

*Id.* at 10. The parties propose competing definitions for the terms "tank blocking structure," "from being disposed at the interior of the frame assembly," and "two fuel tanks of equal size." *See* R. 185, Joint Claim Construction Chart.

In addition, Sears asks the Court to construe the scope of the two design patents. R. 178, Def.'s Br. at 2. The '834 design patent claims an "ornamental design for a shroud for a barbecue grill." J.A. at 372. The '045 design patent claims an "ornamental design for a grill." *Id.* at 376. Weber alleges that Sears has copied the ornamental designs claimed in the '834 and the '045 design patents in a way that would "deceive an ordinary observer, inducing him to purchase one [grill] supposing it to be the other." First Am. Compl. ¶¶ 37-38, 48-49. Sears asks the Court to construe an element of the '834 and '045 design patents (specifically, the fasteners on the riveted bands) as functional and therefore unprotectable under design patent law. Def.'s Br. at 2. And, with respect to the '045 design patent, Sears asks the Court to construe the claimed design to exclude a design element (a horizontal bar) that Sears contends was not disclosed in the original figure submitted to the Patent and Trademark Office (PTO). *Id.*

## II. Legal Standard

Before it can be determined whether a claim is valid or infringed, the Court must first construe the claim in order to determine its scope. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-79 (Fed. Cir. 1995) (en banc); *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476, (Fed. Cir. 1998). "When construing claim terms, we first look to, and primarily rely on, the intrinsic evidence, including

the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013). "'[E]xtrinsic evidence in general' is 'less reliable than the patent and its prosecution history in determining how to read claim terms.'" *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc)).

Claim terms are generally given "their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Butamax(TM) Advanced Biofuels LLC v. Gevo, Inc.*, 746 F.3d 1302, 1309 (Fed. Cir. 2014) (internal quotation marks and citation omitted). "'There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (internal quotation marks and citation omitted).

### III. Analysis

For the '874 patent (the utility patent), the parties propose competing definitions for the terms "tank blocking structure," "from being disposed at the interior of the frame assembly," and "two fuel tanks of equal size." *See* Joint Claim Construction Chart. Because Sears's proposed construction for tank blocking structure includes the phrase "in or at the interior of a grill assembly," and Weber's

proposed construction for tank blocking structure includes the phrase "more than one standard size fuel tank," the Court addresses the second and third disputed terms first and turns last to the construction of tank blocking structure.

## A. At the Interior of the Frame Assembly

The parties dispute the meaning of the term "prevent a second tank . . . from being disposed at the interior of the frame assembly," which appears in Claims 14 through 20 of the '874 patent. Joint Claim Construction Chart. Sears argues that this term should be read to mean "prevent a second tank from maintaining a position in which any *part* of the second tank is within the frame assembly." *Id.* (emphasis added). In other words, Sears contends that "at the interior" does *not* mean that the tank must be "all the way inside." Def.'s Br. at 1, 8. In support of its reading, Sears argues that other claims in the '874 patent prevent a second tank "from being disposed *in* the interior of the frame assembly." *Id.* at 8; *see, e.g.*, J.A. at 9, col. 6:46-47. Applying claim-differentiation principles, Sears contends that the patent's alternate uses of "at" and "in" suggest that each term—really, each preposition—has a different meaning. Def.'s Br. at 8-9. Because the '874 patent occasionally describes a feature as being "at or near" a position, *see, e.g.,* J.A. at 8, col. 4:2-4, Sears proposes that a tank blocking structure that prevents a second tank from being "at"—as opposed to "in"—the interior of a frame assembly "blocks a tank from being near the interior of a frame assembly, but not all the way inside." Def.'s Br. at 11.

Weber, in contrast, proposes giving the term what Weber contends is the term's "plain and ordinary" meaning, so that no construction is necessary. In the alternative, Weber proposes the construction, "prevent more than one tank [from being] . . . placed inside the grill cart." R. 179, Pl.'s Resp. Br. at 6. In support, Weber argues that the determinative word in the relevant limitation is not "at," but rather "interior," because regardless of the preposition used, the resulting location is the same. *Id.* at 7. The Court agrees. Unlike other positional prepositions, that describe one object's position in relation to another object (for example, "on," "under" or "beside"), "at" simply refers to the location itself. When one is "at home," one is home. Similarly, when something is "at the interior," it is inside.

Sears's proposed construction of "at" as "near, but not all the way inside" not only defies the ordinary meaning of "at" in this context, it also is inconsistent with the patent's specification. The specification makes clear that the '874 patent was invented with the goal of "configur[ing] the grill cart such that only one fuel tank may be placed in the interior of the cart." J.A. at 7, col. 2:2-4. If asked to fulfill this goal, no skilled artisan would assume that preventing a second tank from being disposed "at the interior" of the grill cart means preventing a second tank from being stored near, but not all the way inside the cart. Thus, the Court construes "prevent a second tank . . . from being disposed at the interior of the frame assembly" as "prevent a second tank from being placed inside the grill cart."

## B. Two Fuel Tanks of Equal Size

The parties next dispute the meaning of the term "two fuel tanks of equal size" (Claims 1-8), and the related terms, "replacement [fuel] tank having a size equal to a size of the fuel tank" (Claims 9-13), and "second fuel tank, of a size equal to that of the first fuel tank" (Claims 14-20). *See* Joint Claim Construction Chart. Weber proposes construing the term as "two *standard* equal size fuel tanks," whereas Sears proposes "two refillable tanks or cylinders *of any capacity* that have the same dimensions." *Id.* (emphases added). Weber argues that a person skilled in the art at the time of the invention would understand that the ordinary meaning of "fuel tank" is a standard, twenty-pound tank. Pl.'s Resp. Br. at 9. In further support, Weber argues that "[a]ll of the figures [of the '874 patent] clearly depict a standard 20 lb. liquid propane fuel tank (item 50 in Figures 1, 2, and 3) disposed in the grill cabinet." *Id.*

The Court disagrees on both points. If Weber were correct, and a "fuel tank" always referred to a standard, twenty-pound fuel tank, there would be no need to specify that the second fuel tank is *of equal size*. Under Weber's construction, "equal size" would be superfluous because "tank" could only mean a twenty-pound tank. Nor would the prior art identified in the '874 patent have needed to specify that fuel tanks were "standard-sized" (as in the Lohmeyer '964 reference) or "conventional 20 lb." propane tanks (as in the Murray application). *See* R. 179-4, Exh. D, '964 Patent col. 9:66; R. 179-5, Exh. E, Murray Application at 6, ¶ 75. As for Weber's contention that the drawings in the '874 patent "clearly depict a standard 20 lb." tank, this

very argument was submitted to and rejected by the PTO during prosecution, as explained next.

In response to indefiniteness concerns on the part of the PTO Examiner, Weber proposed amendments to Prosecution Claims 1, 6, and 25 of the '874 patent "to clarify that the first tank and the second (i.e., replacement) tank are of equal size, and both are standard 20 lb fuel tanks." J.A. at 282. Weber argued that the amendments did not add new matter because a person of ordinary skill in the art could readily ascertain from the figures that the original tank is a standard twenty-pound fuel tank. *Id.* at 282-83. The Examiner disagreed. In a responsive Office Action, the Examiner rejected Prosecution Claims 1-25 of the '874 patent as failing to comply with the written description requirement, noting,

> Since the drawings are not to scale (specification 6, line 18) it is unclear whether the represented tank is a 20, 10, or 5 pound tank. There is no written description that would lead a person of ordinary skill in the art to understand the dimensions/capacity of either the tank (50) or the replacement tank.

J.A. at 120.[2] The Examiner also found that the added "standard 20 lb" limitation *did* constitute new matter. *Id.* at 122. Weber appealed the rejection, *id.* at 68, and in an Examiner-Initiated Interview in August 2012, the Examiner proposed amendments that would make some claims allowable, *id.* at 55. Following the

---

[2]In an appeal, Weber argued that twenty-, ten-, and five-pound tanks differ substantially in their proportions. J.A. at 84. Thus, it is the *proportions*, rather than the *scale*, of the tanks that would lead a person of ordinary skill to the conclusion that the depicted tank was a standard, twenty-pound tank. *Id.* But Weber noted that the Examiner had previously observed that "the eleven pound and twenty pound cylinder sizes look nearly identical, even when place[d] adjacent to other cylinders that provide the ability to comparatively judge their sizes." *Id.* at 86. The Court agrees. *See id.* at 85 (depicting commercially available fuel tanks). For this and the reasons explained in the text, Weber's argument that the figures clearly depict a twenty-pound tank is rejected.

Interview, Weber accepted the Examiner's proposed language and agreed to cancel certain claims. *Id.* at 30-36. A Notice of Allowability issued. *Id.* at 29.

Weber contends that its "arguments and evidence in the appeal brief (that the . . . tanks shown and described in the '874 patent were standard 20 lb fuel tanks) lead [sic] directly to the USPTO abandoning the appeal and allowing the claims of the '874 patent to issue, with no written description or indefiniteness problem." Pl.'s Resp. Br. at 14. But the Examiner-Initiated Interview that Weber references did not concern any 35 U.S.C. § 112 indefiniteness issues or, for that matter, any of the Claims (1, 6, and 25) that included the problematic "standard 20 lb" language. J.A. at 55; *see also id.* at 275-81. What actually happened between the Interview and the Notice of Allowability was that Weber agreed to cancel all of the claims that included the "standard 20 lb" claim term. *Id.* at 32-36. Thus, the '874 patent's prosecution history undermines Weber's proposed construction in two ways: (1) the figures do not clearly depict a standard, twenty-pound tank, and (2) reading "standard" into the term "two fuel tanks of equal size" would allow Weber to claim new matter that was explicitly rejected by the PTO.

For all of these reasons, Weber's proposed construction is rejected. The Court construes "two fuel tanks of equal size" as "two fuel tanks of any capacity that are of equal size." Based on this construction, "replacement [fuel] tank having a size equal to a size of the fuel tank" and "second fuel tank, of a size equal to that of the first fuel tank" are also understood as referring to fuel tanks of any capacity and which are of equal size.

### C. Tank Blocking Structure

The parties next dispute the meaning of the term "tank blocking structure," which appears in all of the asserted claims of the '874 patent. At bottom, the parties' disagreement stems from whether the structure merely serves the function of blocking a tank, as Sears contends, or whether (in addition to blocking a tank) the structure must also fulfill some function of the grill or must support a component of the grill, as Weber contends. Pl.'s Resp. Br. at 1.

In its brief, Weber originally proposed the following construction of tank blocking structure: a "structure which prevents the storage of more than one standard size fuel tank inside of the frame assembly and holds a grease drip pan for collecting grease from the cooking chamber." *Id.* Sears (rightly) opposed this construction because the dual-function grease-drip-pan/tank-blocker is just one embodiment of the claimed invention. Def.'s Br. at 5; *see* J.A. at 1 ("The preferred embodiment of the tank blocker described herein is adapted to support a component of the grease management system, namely the grease drip pan."). And indeed, a number of the '874 patent's claims describe a tank blocking structure with *no* reference to a grease drip pan (*see* Claims 9 and 13), while others expressly *add* recitation of a grease drip pan (*see* Claim 1). *Id.* at 9-10. Thus, in the context of Claim 1, for example, Weber's proposed construction would redundantly read, "the [structure which prevents the storage of more than one standard size fuel tank inside of the frame assembly and holds a grease drip pan for collecting grease from

the cooking chamber] holding a grease drip pan for collecting grease from the cooking chamber of the barbecue grill assembly . . . ." *Id.*

At the *Markman* hearing, after discussing this apparent fatal flaw in the proposed construction, Weber retreated to its alternate construction for tank blocking structure: "a structure which prevents the storage of more than one standard size fuel tank inside of the frame assembly and also serves as a function of or supports a component of the grill." In essence, Weber now asks the Court to construe tank blocking structure in a way that incorporates a dual function of some kind—not necessarily limited to the grease-drip function.

On the one hand, Weber's proposed construction finds some support in the patent's Abstract, which states, "Because it is known that many consumers never install or even remove prior art tank blockers, the tank blocker of the present invention is adapted to serve as a function of the grill (in addition to the function of blocking a tank) or to support a component of the grill." J.A. at 1. But, on the other hand, the proposed construction is significantly undermined by other parts of the specification. The "Summary of the Inventions" states in relevant part:

> *A first embodiment of the invention* solves the problems identified above by incorporating a tank blocking structure in the interior of the grill cart. This structure would be fastened inside the cart, such that it is not readily removable, and would compartmentalize the interior of the cart such that only one tank will fit in the cart. . . .
>
> Unfortunately, it is believed that some consumers will not install the tank blockers or will remove them when they find out that they will be unable to store a replacement tank on the cart. Consequently, there is a need in the art for a tank blocker for a barbecue grill which will reduce the chance that a consumer will remove the tank blocker and store a replacement tank on the barbecue grill.

Therefore, *the preferred embodiment of the inventions* is adapted to have a dual purpose, whereby the tank blocker serves another function, in addition to the function of blocking the placement of a replacement tank. As such, consumers will have to install the *preferred* tank blocker, lest the grill operate improperly or even be altogether inoperable.

*Id.* at 7, col. 2:9-34 (emphases added). The first line clearly states that one embodiment of the claimed invention *does not* incorporate a dual function, giving rise to the removal risk. Thus, the "preferred embodiment of the inventions" adopts a dual purpose, so that removal will impair the grill's operability.

"As a general rule, it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012) (internal quotation marks and citation omitted). The Federal Circuit refers to this as disavowal, which "requires that the specification or prosecution history make clear that the invention does not include a particular feature, or is clearly limited to a particular form of the invention." *Hill-Rom Servs., Inv. v. Stryker Corp.*, 755 F.3d 1367, 1371-72 (Fed. Cir. 2014) (internal quotation marks, alterations, and citations omitted). "The standards for finding . . . disavowal are exacting." *Id.* at 1371.

Weber contends that its disparagement of the first embodiment (the one that serves only the tank blocking function) demonstrates Weber's intent to incorporate the preferred dual-function element into all the claims. Pl.'s Resp. Br. at 2-3. But the Federal Circuit has made clear that disavowal requires *clear* expression of a

patentee's intent to limit an invention to a particular form—that is, something more than the mere expression of a patentee's preference for that form. *See Hill-Rom*, 733 F.3d at 1371-72; *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012). The '874 patent does not describe the present invention as "requiring" or "including" a dual-function. *Cf. Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367 (Fed. Cir. 2007) (where specification "require[d]" an element, it was "not merely a preferred embodiment, but is a critical element in the process"); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) (where patent stated that a particular feature is the basic feature for "all embodiments of the present invention contemplated and disclosed herein," that feature applied beyond the preferred embodiment). Nor do two sentences in the specification (and their counterpart in the abstract)—opining that some consumers might remove the tank blocker, J.A. at 1, 7—rise to the level of "repeated derogatory statements" about the "inherent inadequacies" and "deficiencies" of a particular embodiment, evincing a clear intent to disclaim it. *See Chicago Bd.*, 677 F.3d at 1372.

It is true that disavowal does not require magic words. *See Hill-Rom*, 755 F.3d at 1373. But controlling case law says that disavowal must meet an "exacting standard"—something more than language that could go either way. This tough standard makes sense: the disavowal doctrine ordinarily is a shield against reading a limitation into a claim. In order to invoke the doctrine, a patent author must overcome the fact that it is easy to avoid calling something an "embodiment" of the

invention if it is not in fact intended to be an embodiment of the invention. A patent author should not *also* be allowed to use the disavowal doctrine as a sword to ward off invalidity challenges. The effect of allowing disavowal in this context (as sword, not shield) is this: a patent owner is permitted first to use broad language to constrain competition, and then to "disclaim" the same language in litigation to bolster validity and infringement contentions—in essence, receiving the best of both worlds.

Section 112's written-description requirement is intended not only to allow a person skilled in the art to reproduce the invention after the patent's expiration, "but also *to inform the public during the life of the patent of the limits of the monopoly asserted*, so that it may be known which features may be safely used or manufactured without a license and which may not." *Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60 (1931) (emphasis added). Thus, to align with the purposes of the statute, the "clear intent" required for disavowal should be an expression so clear that the relevant public would understand the claims to be so limited. *See Phillips*, 415 F.3d at 1312 ("Because the patentee is required to 'define precisely what his invention is,' . . . it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886))). In light of § 112's purpose and Federal Circuit precedent, Weber has not met the "exacting standard" for proving that the dual function is anything other than what it is called: a preference, not a defining limitation.

This conclusion is further supported by the fact that independent Claims 9 and 13 describe a tank-blocking structure that serves *no* dual purpose. J.A. at 9-10. Weber counters by arguing "that the dual purpose tank blocking structure was one of the Examiner's principal reasons for allowing <u>all of the claims</u>"— suggesting that the dual-function limitation should be read into even those claims that prescribe no function other than tank-blocking. Pl.'s Resp. Br. at 4 (emphasis in original). But Weber misapprehends the Notice of Allowability. *See* J.A. at 36. The Notice first listed which claims would be allowed (2, 3, 5, 7, and 9-24), and then provided a list of reasons for their allowance, without specifying which reasons corresponded with which claims. It is true that the grease-drip limitation is listed as one reason that the Examiner allowed the claims. But another listed reason is "the tank blocking structure is spaced apart from and positioned below the cooking chamber and is not suspended from the cooking chamber," *id.*—a limitation that does not appear in all of the issued claims. Thus, it is evident that the Examiner's listed reasons for allowance are cumulative and do not apply to each claim individually.

For all of these reasons (and in light of the Court's construction of the two disputed terms above), the Court construes tank blocking structure as "a structure that prevents more than one fuel tank from being placed inside the grill cart frame assembly at one time."

### D. Riveted Band

Sears next asks the Court to construe the '834 and '045 design patents to remove an allegedly functional element from the scope of the claimed designs. Def.'s

Br. at 5. Specifically, both design patents depict, in part, a riveted band along the outer edges of the grill shroud:



J.A. at 373 ('834 design patent).



*Id.* at 377 ('045 design patent). Sears contends that the fasteners or rivets that secure the band to the shroud are primarily functional and therefore should be removed from the scope of each design patent. Def.'s Br. at 15. In response, Weber argues that the exposed-rivet band design, on the whole, is primarily ornamental rather than functional.

In *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (*en banc*), the Federal Circuit considered the question of whether and how trial courts should construe claims in design patent cases. For the most part, the Federal Circuit left these questions to the discretion of trial courts and reiterated the general principle that a verbal description of the design is usually unhelpful (that is—a picture is worth a thousand words):

> While this court has held that trial courts have a duty to conduct claim construction in design patent cases, as in utility patent cases, the court has not prescribed any particular form that the claim construction must take. To the contrary, the court has recognized that design patents typically are claimed as shown in drawings, and that claim construction is adapted accordingly. . . .
>
> . . . Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to "construe" a design patent claim by providing a detailed verbal description of the claimed design.

*Id.* at 679 (internal quotation marks and citations omitted). But sometimes endeavoring to describe the design is permitted and helpful, depending on the circumstances:

> With that said, it is important to emphasize that a district court's decision regarding the level of detail to be used in describing the claimed design is a matter within the court's discretion, and absent a showing of prejudice, the court's decision to issue a relatively detailed claim construction will not be reversible error. At the same time, it should be clear that the court is not obligated to issue a detailed verbal description of the design if it does not regard verbal elaboration as necessary or helpful. In addition, in deciding whether to attempt a verbal description of the claimed design, the court should recognize the risks entailed in such a description, such as the risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole. . . .

*Id.* at 679-80. One of the points in favor of providing a description, under the right circumstances, is to distinguish ornamental features from functional ones:

> . . . Apart from attempting to provide a verbal description of the design, a trial court can usefully guide the finder of fact by addressing a number of other issues that bear on the scope of the claim. Those include such matters as describing the role of particular conventions in design patent drafting, such as the role of broken lines; assessing and describing the effect of any representations that may have been made in the course of the prosecution history; and *distinguishing between those features of the claimed design that are ornamental and those that are purely functional.*

*Id.* at 680 (internal citations omitted) (emphasis added).

After *Egyptian Goddess*, the Federal Circuit again addressed the issue of construing a design patent in *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288 (Fed. Cir. 2010). There, the Federal Circuit considered a district court's construction of a design patent claiming a multi-function carpentry tool that combined a conventional hammer with a stud-climbing tool and a crowbar. *Id.* at 1290. Following a bench trial, the district court issued an order that first construed the design patent and then addressed the claims of infringement. *Id.* at 1292. As part of its claim construction, the district court distinguished the ornamental aspects from the functional aspects of the claimed design, leaving only the ornamental aspects for comparison at the infringement stage. *Id.* at 1292-93. On appeal, the patent owner argued that the district court "erred in its claim construction by separating the functional aspects of the design from the ornamental ones, rather than considering the design as a whole." *Id.* at 1293. The Federal Circuit affirmed the district court's claim construction, holding that when an invention contains both functional and ornamental aspects, "it is entitled to a design patent whose scope is limited to [the

ornamental] aspects alone and does not extend to any functional elements of the claimed article." *Id.* at 1293-94.

Relying on *Richardson*, Sears argues that the '834 and '045 design patents must be construed to remove a primarily functional element: the fasteners that secure the riveted bands to the grill shroud. Def.'s Br. at 16. But Sears's functionality analysis is more akin to an invalidity contention than to a question of construction. In support of its argument, Sears introduces considerable extrinsic evidence of the alleged functionality of threaded screws and other fasteners. *See id.* at 17-18 (citing Wikipedia; Weber's engineering documents; industry standards of performance; a fastener manufacturer's website). The problem is that none of the alleged evidence of functionality is apparent from the '834 and '045 figures. The figures do not depict the exposed rivets as threaded screws or any sort of particular fastener.[3] *See* J.A. at 372-75 ('834 design patent), 376-80 ('945 design patent). In fact, it is entirely unclear from the claimed figures how the riveted bands are even attached to the grill shroud. Based on the claimed figures alone, a person of ordinary skill might well come to the conclusion that the rivets are fake (that is, purely ornamental and not actually fastening the bands to the shroud), and that the bands are affixed to the shroud with a bonding agent or some other means.

Claim construction asks a court to determine, from the perspective of a person of ordinary skill, what precisely a patent has put the public on notice of— that is, how the claimed language or, in this case, drawings framed "the scope of the

---

[3]Sears's contention that the rivets are essentially threaded screws is based on engineering drawings and a factory tour video that are not part of the design patents at issue. *See* Def.'s Br. at 18-19.

patentee's right to exclude." *See Markman*, 52 F.3d at 978-79. It is a question of law, to be decided by the trial court, "toward the end of fact discovery" (under this jurisdiction's Local Patent Rules). *Id.*; N.D. Ill. L.P.R. at 1. Functionality, in contrast, is an affirmative defense to a claim of infringement that, if proven, invalidates a design patent. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993). "Whether a patented design is functional or ornamental is a question of fact." *PHG Technologies, LLC v. St. John Cos.*, 469 F.3d 1361, 1365 (Fed. Cir. 2006). The two concepts intersect because functional aspects of a design patent are unpatentable and must, therefore, be filtered out of a design patent. *Richardson*, 597 F.3d at 1293-94. But, other than their ultimate ability to bear on the scope of a claimed design, claim construction and functionality pose entirely distinct questions that will generally be answered by different evidence at different stages in the litigation.

Sears argues that, under *Richardson*, "it would be error on claim construction not to separate out the functional elements from the supposedly decorative." R. 184, Def.'s Reply Br. at 10. But that is too restrictive a reading of *Richardson* for two reasons. First, the district court in *Richardson* was atypically poised to consider the questions of claim construction and functionality simultaneously, because the district court addressed both questions at the *trial* stage. In the typical case (at least in this District), a court holds a *Markman* hearing, construes disputed terms, and *then* proceeds later in the case to the merits via summary judgment or trial. Thus, substantive issues like invalidity and infringement are reserved for the fact

finder, at a stage in the litigation when discovery is complete. But in *Richardson*, the district court appears to have condensed both claim-construction and the merits into a single bench-trial proceeding. *See Richardson v. Stanley Works, Inc.*, 610 F. Supp. 2d 1046 (D. Ariz. 2009). This was possible because, as the finder of both fact and law, the district court did not need to settle on claim constructions in advance of trial for the benefit of a jury. Following the bench trial, the district court entered a single order first construing the design patent (for itself) and then considering whether the claimed design had been infringed. *See id.* Thus, unlike the typical case, the *Richardson* trial court was able to consider claim construction and functionality together, with the benefit of a fully developed record at trial.

Second, in affirming the district court's claim-construction ruling, the Federal Circuit opined that the patent owner's "argument that the court erred in separating out functional aspects of his design essentially is an argument for a claim scope that includes the utilitarian elements of his multi-function tool." *Richardson*, 597 F.3d at 1294. Allowing the patent owner to claim those elements, the Federal Circuit posited, would be improper. *Id.* In other words, *Richardson* makes clear that a trial court must filter out primarily functional elements from a design patent's scope before a fact finder may consider whether the design was infringed. But, contrary to Sears's position, it does not mandate *when* that separation between function and ornament must occur in the litigation.

At bottom, *Richardson* does not disturb *Egyptian Goddess*'s holding that the contours of claim construction in the design patent context are left to the district

courts' discretion. *See* 543 F.3d at 679-80. Here, the Court views claim construction as the process of determining how a person of ordinary skill in the field of invention would understand a claim at the time of the invention, and ascribing meaning to disputed terms accordingly. *See Phillips*, 415 F.3d at 1312-13. Employing that standard, it is clear that a person of ordinary skill would understand the designs claimed in the '834 and '045 design patents to encompass the exposed rivets. To be sure, Sears may ultimately prove—after the close of expert discovery, in a substantive motion—that the rivets actually are threaded screws that serve a primarily functional purpose. And, in that event, the Court would remove the rivets from the scope of the '834 and '045 design patents, as mandated by *Richardson*. But, under the circumstances, the Court will not accelerate a fact-intensive inquiry, and especially one that, in effect, bears on the validity of Weber's design patents, to this early claim-construction stage just because the Federal Circuit has recognized that there are some circumstances in which it might be proper to do so. For now, the Court construes the '834 and '045 design patents just as the drawings show: as including the riveted bands.

### E. Horizontal Bar

Finally, Sears asks the Court to remove another feature of the '045 design patent: specifically, a horizontal bar that borders the lower, side edges of the grill cart in Figures 4 and 5 of the '045 design patent. Joint Claim Construction Chart. Figures 1, 4, and 5 of the '045 design patent are shown below:



FIG. 1

FIG. 4    FIG. 5

J.A. at 377, 380. Sears contends that the horizontal bar along the lower, side edges of the grill cart (visible in Figures 4 and 5) does not appear in Figure 1 and was rejected by the examiner as new matter during prosecution. Def.'s Br. at 23-24. Accordingly, Sears asks the Court to construe the '045 design patent without the horizontal bar.

Turning first to the alleged inconsistency between Figure 1 and Figures 4 and 5, it is clear that Figures 4 and 5 depict a horizontal edge or bar along the lower, side edges of the grill cart that Figure 1 does not:



Weber argues that this inconsistency is merely a matter of perspective—that is, that "the bottom edge clearly shown in Figures 4 and 5 of the patent is simply not visible from the perspective of Figure 1." Pl.'s Resp. Br. at 21. Weber's unpersuasive argument is rejected. It is true that Figure 1 offers an elevated view, but the considerable depth of the left side shelf belies Weber's argument that the bottom edge is simply too condensed to be visible. It would be a very simple matter to draw the edge in Figure 1, despite the angled, elevated perspective.

Turning to Sears's second argument, during the prosecution of the '045 design patent, the Examiner rejected certain drawings because they added new matter that was not disclosed in the parent application. Def.'s Br. at 23; *see* J.A. at 514. The rejection notice instructed Weber to "[n]ote the enclosed prints of figs. 1-7 wherein examiner tried to mark up the differences" between the rejected figures and the originals. J.A. at 514. With respect to Figure 1, the Examiner pointed to the

horizontal bar and wrote "edge not visible in 1A." *See id.* at 517. After receiving the rejection notice, Weber amended Figure 1 by altering its perspective and removing the horizontal bar. J.A. at 505. Below are (1) the original Figure 1A, (2) the "mark-up" of rejected Figure 1, and (3) replacement Figure 1 as issued:



Figure 1A





FIG. 1

J.A. at 659, 517, 377. Because replacement Figure 1 does not depict the horizontal bar, Sears contends that Weber surrendered that element in order to receive the '045 patent and, as a result, cannot now reclaim it. Def.'s Br. at 24; *see also Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 703-04 (Fed. Cir. 2014) (holding prosecution history "estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope" (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002)) (internal quotation marks and alterations omitted)).

There are two problems with Sears's argument. First, the image of Figure 1A above is supposedly the best available copy of the figure originally submitted with the '045 design patent application. Based on the extremely poor image quality, it is impossible to determine whether the Examiner's note ("edge not visible in 1A") refers to the horizontal bar specifically or to the bottom edge of the grill cart as a whole not being visible. Indeed, the bottom half of the image is so difficult to make

out that the Examiner also rejected the wheel detailing as "not visible in fig. 1A." *See* J.A. at 517. Second, although Weber did remove the horizontal bar from replacement Figure 1, the horizontal bar is still clearly visible in replacement Figures 4 and 5 (which were ultimately issued as submitted). *See id.* at 505, 508. Thus, there is insufficient evidence in the record to conclude that Weber surrendered the horizontal bar design element to secure the '045 design patent.

Without the prosecution-history-estoppel argument, Sears's remaining basis for its proposed construction of the '045 design patent is the inconsistency between Figure 1 and Figures 4 and 5 of the patent as issued. As discussed above, it is true that there is an inconsistency in those figures. But Sears cites no authority for the proposition that inconsistencies in a design patent should be resolved through claim construction. On the contrary, Federal Circuit case law suggests that Sears's argument is once again more appropriately couched in terms of invalidity (this time as a potential indefiniteness contention) than claim construction. *See Antonious v. Spalding & Evenflo Cos.*, 217 F.3d 849, at *6-7 (Fed. Cir. 1999) (unpublished). As with Sears's functionality argument, if Sears wishes to assert an invalidity contention on this basis, it may do so in a later, substantive motion. For now, the

Court does not exclude the horizontal bar from the grill design claimed in the '045 design patent.

ENTERED:

      s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: October 20, 2014