# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WEBER-STEPHEN PRODUCTS LLC, ) | |
| ) | |
| Plaintiff, ) | No. 1:13-cv-01686 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| SEARS HOLDING CORPORATION and ) | |
| SEARS, ROEBUCK & CO., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

## I. Introduction

Weber-Stephen Products LLC makes and sells Weber grills. Sears Holding Corporation and Sears, Roebuck & Company own and operate retail and online stores.[1] Sears sold Weber's grills until Weber stopped supplying Sears in 2012. Not long after, Weber sued Sears, alleging, among other things, that Sears's Kenmore-brand grills infringed some of Weber's grill-related patents. Sears countersued.[2]

This Opinion resolves Weber's motion for summary judgment against two of Sears's counterclaims. R. 193, Mot. Summ. J. One of those claims is a *Walker Process* claim, the gist of which is that Weber obtained one of its grill patents by fraud and then used the patent to monopolize the market for premium gas grills.

---

[1] Except when necessary, the Opinion will refer to the two Defendants collectively as Sears.

[2] The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a) & (b), 2201, 2202, and 1367(a). Docket citations are noted as "R. [docket entry number]."

Summary judgment is granted as to this claim because no reasonable jury could conclude that Weber used the allegedly fraudulent patent to monopolize the relevant market. The other claim is for breach of contract. Sears alleges that Weber breached a 1998 agreement between the companies when Weber cut them off in 2012. Summary judgment is granted in part and denied in part as to this claim, as explained below.

## II. Background

### A. Sears & Weber

Sears Holding Corporation wholly owns Sears, Roebuck & Company. SSOF ¶¶ 6-7.[3] Sears owns and operates Kmart and Sears retail stores and the sears.com, kmart.com, and kenmore.com retail websites. *Id*. ¶ 8. Sears also sells outdoor grills and accessories under the Kenmore brand name. *Id*.

Weber-Stephen Products LLC is also in the grill business. *Id*. ¶ 2. Weber designs, develops, manufactures, and provides outdoor gas, charcoal, and electric grills and grilling accessories under the Weber brand name. *Id*. Weber holds certain grill-related patents, including United States Patent No. 8,347,874, entitled "Grease Drip Pan and Gas Tank Blocker for a Barbecue Grill." *Id*. ¶ 3.

---

[3]Citations to the parties' Local Rule 56.1 Statements are "WSOF" (for Weber's Statement of Facts) [R. 196]; "SSOF" (for Sears's Response to Weber's Statement of Facts and Additional Facts) [R. 215]; "WRSAF" (for Weber's Response to Sears's Additional Facts) [R. 228], followed by the paragraph number. Where a fact is admitted, only the admitting party's statement is cited. The Court notes that some of WRSAF was stricken. R. 237. The stricken portions were not considered.

2

## B. The 1998 Agreement

Sears and Weber-Stephen Products Company (predecessor to party Weber-Stephens Products LLC) signed a written agreement titled "Sears, Roebuck and Co. Universal Terms and Conditions." *Id*. ¶ 38; R. 215-2, Agrmt. at 1. The agreement applied to "all merchandise sold by [Weber] to [Sears] and shipped on or after Jan. 1, 1998." Agrmt. at 1. Primarily, the agreement governs Weber's role as a supplier to Sears, providing standard terms for future transactions.

Several provisions are important to this motion. First, the agreement is integrated: "This Agreement shall supersede all other agreements, communications and understandings between the parties that are inconsistent with the terms hereof." *Id*. Second, it prohibits unwritten waivers: "No right of either party under this Agreement may be waived except as expressly set forth in a writing signed by the party waiving such right." *Id*. at 4. Third, it requires Sears's written consent to assignment: "[Weber] shall not assign (by contract, operation of law or otherwise) its rights or obligations under this Agreement … except with Sears prior written consent." *Id.* And finally there is a passage that obligates Weber to sell certain parts to Sears for a certain amount of time:

> PARTS – [Weber] shall sell to Sears any and all parts shown on Merchandise part lists for a period of at least ten (10) years after the date such Merchandise is last produced by [Weber]; provided, however, that if [Weber] discontinues manufacturing or supplying any part shown on any Merchandise parts list, [Weber] shall give Sears at least ninety (90) days prior written notice of such discontinuance and [Weber] shall promptly fulfill any and all orders placed by Sears within such 90-day period. The price of parts shall be specified on the applicable Purchase Orders, but in no event shall Seller charge Sears a price greater than the lowest price charged by [Weber] to any other

customer for the same or similar parts sold on substantially similar terms.

*Id.* at 3.[4] Sears alleges that Weber breached this "Parts" provision by refusing to sell Sears grills and parts at wholesale[5] prices. R. 139, Sears's Answer and Counterclaims ¶¶ 19-30, 139-47.

### C. Weber-Stephen Products LLC Buys Weber-Stephen Products Co.'s Assets

In late 2010, Weber emailed Sears about a change in its business structure. R. 196-7 at 4. The email, and an attached letter, made several points:

- That the Stephen family, owners of Weber, and another private firm were creating a new entity that would "purchase substantially all of Weber[-Stephen Products Company's] assets relating to the manufacture and distribution of gas and charcoal grills and related accessories";

- That the new entity would "continue to operate Weber's business";

- And that Weber wanted Sears's written consent to assign the 1998 agreement to the new entity.

---

[4]This "Parts" provision could be read to conflict with an earlier passage providing that "Nothing contained herein shall be construed as a commitment … by [Weber] to supply[] any quantity of merchandise." Agrmt. at 1. Weber quoted this passage in its briefing, R. 227, Weber's Reply Br. at 15, but did not rely on it to argue that it had no obligation to sell Sears anything and therefore could not have breached the agreement by, as Sears claims, refusing to sell Sears parts at wholesale. Accordingly, that argument is waived. *Williams v. Dieball*, 724 F.3d 957, 962-63 (7th Cir. 2013). Also, Sears would have had a strong counter-argument that the "Parts" provision controls over the more general "nothing" section. *See Brzozowski v. N. Trust Co.*, 618 N.E.2d 405, 408 (Ill. App. Ct. 1993) ("[W]here ambiguities exist in a contract between two provisions, the more specific provision relating to the same subject matter controls over the more general provision.").

[5]The contract does not say "wholesale." It says that "in no event shall [Weber] charge Sears a price greater than the lowest price charged by [Weber] to any other customer for the same or similar parts sold on substantially similar terms." Agrmt. at 3. For brevity, the Court will use "wholesale" or "below retail" as a shorthand for the price dictated by this provision.

4

*Id*. The new entity referred to in the letter turned out to be Weber-Stephen LLC, the plaintiff and counter-defendant here. SSOF ¶ 85; R. 194-3 at 2; R. 217-55.

Sears responded by sending its "latest Universal Terms and Conditions" agreement, which Sears said "the new entity will be required to sign in order to do business with Sears and Kmart." R. 196-7 at 2. This "latest" agreement is, in content, similar to the 1998 agreement. No party contends that Weber, the new entity or the old one, ever signed the "latest" agreement or that Sears ever gave written consent to the assignment.

Nonetheless the new Weber entity and Sears continued to do business as if the first contract had been formally assigned. R. 215-4 ¶¶ 3-7. The year after the new entity took over, Weber sold Sears over 44,000 grills; the next year, over 35,000. *Id*. And Sears continued to pay Weber for the grills by transferring money to the same Weber bank account it had always used. *Id*. ¶ 3. The matter of assignment appears to have been dropped.

### D. Sears Allegedly Violates Weber's Minimum Advertised Price Program and Weber Cuts Sears Off

After the "LLC" took over from the "Co.," Weber developed an advertising-compliance program for its "distributors, dealers, and resellers." R. 215-12 at 2. The program is called the Minimum Advertised Price (MAP) program. *Id*. The MAP program allowed Weber to punish retailers that advertised Weber products at prices that dipped below minimums set by Weber. *Id*. Under the program, retailers got only two strikes before "termination (indefinitely) of buying privileges for Weber Products …." *Id*. at 3.

About five months after the program went live, R. 215-16 at 2, Weber notified Sears that "both Sears and Kmart have breached the MAP Program" and "the consequences for a second confirmed breach of MAP Program is the immediate and indefinite loss of buying privileges for Weber Products from Weber and any of its distributors." *Id*. Sears protested the violation. R. 215-17 at 2-3. In response, Weber agreed to lift the sanction for the first violation, but again warned Sears that "ANY additional confirmed breach of Weber's MAP Program by either Sears or Kmart will result in the immediate indefinite loss of buying privileges for Weber Products." R. 215-20 at 2.

Also in May, Weber personnel met with Sears personnel to give notice that Weber "would stop selling WEBER brand grills and accessory products to Sears, Roebuck & Co., for all of its retail channels, for the upcoming 2013 selling season." R. 215-30 at 2. (The summary judgment evidence does not make clear what impact Sears's MAP violations had on this decision, if any.) Weber confirmed this decision by letter dated August 27, 2013. *Id*. This meant an end to the business relationship between Weber and Sears. *Id*. Before cutting Sears off completely though, Weber allowed Sears to place final, bulk orders of replacement parts, at below-retail prices. *Id*. at 3; R. 215-4 ¶¶ 9-11. Sears made those allowed purchases. R. 215-4 ¶¶ 9-11. Since then Sears has had to make part purchases, as necessary to service its customers, at retail prices. *Id*.

### F. This Case

Shortly after ending its business relationship with Sears, Weber sued Sears for, among other things, infringing the '847 patent. R. 1, Compl. Sears counterclaimed, alleging, among other things, that Weber breached the 1998 agreement and that Weber obtained the '847 patent by fraud, rendering its attempt to enforce that patent here a violation of the antitrust laws. Sears's Answer and Counterclaims. Now, Weber moves for summary judgment on Sears's contract and patent-related antitrust claims.

### III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of*

*Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### IV. Analysis

#### A. The *Walker Process* Claim (Count X)

Generally speaking, competitors may sue each other for monopolization no matter how the alleged monopoly is achieved. One section of the antitrust laws provides the private right of action: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue … and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. And another section "forbids" monopolization: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty …." 15 U.S.C. § 2. A *Walker Process* claim is a species of monopolization claim that targets the use of a fraudulently obtained patent to obtain or maintain a monopoly. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 176 (1965).[6]

---

[6]*Walker Process* claims are frequently brought as counterclaims by those accused of patent infringement. They are, however, *in*frequently successful: "Although extremely unsuccessful before the courts, antitrust plaintiffs continue to raise *Walker Process* claims as an offensive litigation tactic. The threat of treble damages and the protracted and costly litigation of antitrust claims lead many executives to reassess the benefits of protracted legal action." David R. Steinman, Danielle S. Fitzpatrick, *Antitrust Counterclaims in Patent*

8

Without *Walker Process* liability, monopolization-via-patent would be legal, because patents legitimately function as a limited grant of antitrust immunity. *Walker Process*, 382 U.S. at 177 ("'A patent … is an exception to the general rule against monopolies'") (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806 (1945)). A successful *Walker Process* claim pierces that immunity. "The gist of [a *Walker Process*] claim is that since [the patent-holder defendant] obtained its patent by fraud it cannot enjoy the limited exception to [the antitrust laws] but must answer … to those injured by *any monopolistic action taken under the fraudulent patent claim*." *Id.* at 176 (emphasis added). Note the focus on monopolistic action "taken under" the patent. The *Walker Process* claim must focus on monopolistic actions involving the fraudulent patent; monopolistic actions that do not are irrelevant. *See Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1351 (Fed. Cir. 2011) ("A patent owner or assignee that enforces a patent that was procured by fraud on the PTO loses the exemption from antitrust liability that ordinarily protects a patent holder in its enforcement efforts.").

This narrow focus has consequences for how plaintiffs must prove their *Walker Process* claims. After a *Walker Process* plaintiff proves that the defendant's patent was obtained by fraud, *see C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340,

---

*Infringement Cases: A Guide to Walker Process and Sham-Litigation Claims*, 10 TEX. INTELL. PROP. L.J. 95, 99 & n.22 (2001) (noting that "a 1993 survey found that since January 1, 1985, only two out of twenty-five cases in which *Walker Process* claims were finally adjudicated were successful …. Since 1993, only one case has found liability for a *Walker Process* claim …. And only one published case appears to have survived summary judgment since 1993").

1364 (Fed. Cir. 1998),[7] the plaintiff must then prove all the elements of a typical monopolization claim. *Walker Process*, 382 U.S. at 177-78. One of those elements is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The *Walker Process* plaintiff must prove this "willful acquisition or maintenance" element solely by reference to the defendant's use of the fraudulently obtained patent. *See Walker Process*, 382 U.S. at 177-78 ("To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved."). Monopolistic actions that having nothing to do with the patent do not count—monopolization *by* patent is key.

Here, Weber argues that Sears cannot show monopolization by patent: "Sears … cannot show that Weber engaged in *exclusionary* conduct—meaning that it used the '874 patent to exclude Sears from selling grills. This is the *sine qua non* of a *Walker Process* claim and is the only alleged wrongful conduct in Count X." R. 195 [Weber's Br.] at 9. To survive this challenge, Sears needed to submit evidence sufficient to allow a reasonable jury to find that Weber used the '847 patent to "dominate" the market and "drive all or most substitutes from" it. *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 264-65 (7th Cir. 1984) ("If a patent has no

---

[7]Weber conceded this element, but just for purposes of the motion. Weber's Br. at 4, n.1.

significant impact in the marketplace, the circumstances of its issuance cannot have any antitrust significance.").[8] Sears completely failed to do so.

Although Sears argued that Weber holds monopoly power in the market for premium gas grills, Sears never argued that Weber *used* the '847 patent to get that power. R. 224, Sears's Resp. Br. at 8-9. The closest Sears came was its argument that Weber's filing of this patent-infringement suit, based on the '847 patent, has caused Sears antitrust injury. *Id.* at 10-11. Sears claims that this suit excluded it from the relevant market, in the antitrust sense, by forcing it to modify its grill design and incur the costs of defending this case. *Id.* But, even assuming Sears is right as to antitrust injury, it would not follow that Sears's claim would survive summary judgment.

Antitrust injury is not the same as willful acquisition of monopoly power. And Sears never argues that this single lawsuit—or any other evidence—could allow a reasonable jury to infer that Weber, by use of the '847 patent, dominates the market. Accordingly, Weber has failed to offer any proof on this necessary part of its claim. *Celotex*, 477 U.S. at 323 ("[T]here can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Summary judgment is therefore appropriate.

---

[8]District Courts must apply Federal Circuit law to the "fraudulently obtained" element of a *Walker Process* claim and their own regional Circuit law to the monopolization element. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998). Accordingly, Seventh Circuit law applies to the antitrust issues raised by this motion.

Based on Sears's briefing, it appears as though Sears thought it could prove a *Walker Process* claim by proving any kind of monopolization. This would explain why Sears focuses so much of its evidence and briefing on Weber's MAP program. Sears's Resp. Br. at 9. The declaration of Sears's economist, for example, relies almost exclusively on MAP to argue that Weber has monopoly power. R. 215-23 at 12-28. It mentions the '847 patent only in passing: "Lastly, note that if the evidence supports Sears' contention that Weber fraudulently obtained the '847 patent, then Weber's current actions in attempting to enforce that patent … would constitute an anticompetitive tactic …." *Id*. at 27. This passage, and others, show that Weber's economist never considered whether—much less concluded that—Weber used the '847 patent to obtain its market power. Her report, therefore, is of no help to Sears.

Against Sears's lack of evidence, Weber offers a substantial showing that the '847 patent does not dominate the market, let alone was used to acquire a monopoly. Sears was never excluded from the relevant market by the '847 patent. A Sears representative explained that, in spite of this litigation, Sears has "continued to sell the [allegedly infringing] grill from the day we initially launched it." R. 196-2 at 19:18-24, 22:11-24, 23:2-18. The same representative admitted, generally, that the gas-grill market is extremely competitive, with lots of consumer options: "The United States is an incredibly competitive market. There's a lot of consumer choice. There's a lot of options. There's many different products that you compete with …." *Id*. at 72:6-19. Of the *premium* gas grill market, the representative said there was "much less competition," but he still had to concede that Sears and others compete

12

with Weber. *Id.* at 73:5-74:23. This unrebutted evidence suggests that the '847 patent lacks the necessary "antitrust significance." *Brunswick*, 752 F.2d at 264-65.[9]

## B. The Breach of Contract Claim (Count XII)

Sears alleges that Weber breached the 1998 agreement in 2012 when Weber refused to allow Sears to continue to buy Weber parts at below-retail prices. Sears's Answer and Counterclaims ¶¶ 19-30, 139-47. Weber seeks summary judgment against this claim for two reasons. First, Weber argues that Sears sued the wrong "Weber" entity. Weber's Br. at 11-12. And second, Weber argues that Sears has no damages. *Id.* at 12-13. The Court rejects both arguments, although Sears will be limited to seeking at trial only those damages consistent with the theory of breach it pled, as explained below.

### 1. The Weber Entity

The parties to the 1998 Agreement were Sears[10] and Weber-Stephen Products Company. Agrmt. at 1. In late 2010, The Stephens Family and a private investment group created Weber-Stephen Products LLC. The LLC then acquired substantially all the assets of Weber-Stephen Products Company. R. 196-7 at 3; SSOF ¶ 85; R. 194-3 at 2; R. 217-55. Sears's breach of contract claim identifies the LLC as the defendant. Sears's Answer and Counterclaims. The LLC argues that it

---

[9]The parties also disputed other aspects of the *Walker Process* claim, including the validity of Sears's market definition and whether Weber had market power within that market. Because Sears failed to show that a question of fact on the '847 patent's "antitrust significance" in the market, it is unnecessary to address these other issues, which presented much closer questions.

[10]Sears includes the holding company and the "& Roebuck" entity. No one has argued that the distinction matters here.

13

was not a party to, and therefore not bound by (and incapable of breaching), the 1998 agreement. Weber's Br. at 11. Sears's briefing in opposition appears to make four arguments. Sears's Resp. Br. at 12-14. The Court will address each one. Two are independently sufficient to withstand summary judgment; the other two are not persuasive.

For the sake of completeness, the Court considers the two unpersuasive arguments. First, Sears argues that, in the course of this litigation, the LLC admitted—twice—that it was a party to the contract: once in its motion to dismiss briefing and once in jurisdictional briefing. *Id.* at 12; SSOF ¶¶ 83-84. The motion to dismiss briefing, however, never actually concedes that the LLC is the proper party to the contract. R. 43-1 at 14, 15, 17. And even if it did, the concession would be irrelevant to *this* motion because accepting an opponent's allegation as true in a motion to dismiss is not accepting the allegation as proven fact for purposes of summary judgment or trial.

The jurisdictional briefing is similarly unhelpful to Sears. All the LLC said was that Sears's contract claim was "so related" factually to the LLC's patent infringement claim that this Court should exercise supplemental jurisdiction over the contract claim. R. 107 at 2, 8. For claims to be "so related" requires only a "loose factual connection." *See Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995). So all the LLC has conceded is that the contract claim and the infringement claim have a loose factual connection. From that, it does not necessarily follow that the LLC is bound by the 1998 agreement. Sears asserts—but fails to explain—otherwise.

The second unpersuasive argument is that Sears and the LLC allegedly formed a new contract. Illinois law allows contract formation based on conduct where the parties' writings would not otherwise support it. *See* 810 ILCS 5/2-207(3). It is possible that the LLC and Sears did form a contract in this way. The LLC appears to have taken over for the Company in late 2010. For another two years or so after that the LLC and Sears appear to have continued to do business as if Weber's corporate form had not changed. R. 215-4 ¶¶ 4-7. The LLC continued to supply Sears with Weber grills and Sears continued to sell them. *Id.* This conduct could support the existence of a new contract.

But this does not help Sears because "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (rejecting argument that amounted to an unpled theory of liability) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996)). Here, Sears pled a breach of the 1998 agreement explicitly. Sears's Answer and Counterclaims ¶¶ 19-20, 139-47. It did not plead a breach of some new, implied-by-conduct contract. Accordingly, this argument is rejected.

There are, however, two arguments advanced by Sears that require denial of summary judgment. First, Sears argues that Weber-Stephen Products Company's conduct worked an assignment of the agreement to the LLC. Weber responds, rightly, that the contract required Sears's written consent to any assignment, and that consent was sought but not obtained. R. 227, Weber's Reply Br. at 14. Weber

adds (this time wrongly) that Sears was incapable of waiving its right to consent in writing. *Id*. Weber argues that "[a] signed agreement which excludes modification … except by a signed writing [which this agreement does] cannot otherwise be modified." *Id*. (emphasis omitted) (citing 810 ILCS 5/2-209(2)). But Weber ignores a later subsection within the same code provision: "Although an attempt at modification or rescission does not satisfy the requirements of [the section Weber relies on] it can operate as a waiver." 810 ILCS 5/2-209(4). So Sears was capable of waiving its right to written consent.

So the question is whether a reasonable jury could find that they did. To get there, Sears must show either that Weber reasonably relied on its asserted waiver or that the waiver was clear and unequivocal. *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 297 (7th Cir. 2002) (relying on Illinois law). Here, Sears can show—to the degree necessary on summary judgment—reasonable reliance. Sears has undisputed evidence that Weber continued to sell Sears tens of thousands of grills after Sears failed to sign and return Weber's consent-to-assignment letter. R. 215-4 ¶¶ 4-7; R. 196-7. From Weber's willingness to make those sales, a reasonable jury could infer Weber relied on Sears's waiver of its right to consent in writing.

Finally, Sears appears to argue that the LLC is bound by the contract as the Company's "successor." Illinois follows the general rule that when a company buys another's assets, the buyer does not take on the seller's liabilities. *Vernon v. Schuster*, 688 N.E.2d 1172, 1175 (Ill. 1997). One exception to this rule is when the acquiring company agrees, explicitly or implicitly, to do so. *Id*. at 1175-76. Here,

16

there is evidence from which a reasonable jury could infer that the LLC agreed to take on the Company's obligations under the 1998 agreement. First off, the Company offered to assign the contract to the LLC. R. 196-7 at 4 ("Weber will assign its rights under the Agreement …"). The Company probably had the LLC's consent to make that offer. After all, the Company involved the same people as the LLC and one apparent purpose of the LLC's acquisition of the Company's assets was for the LLC to take over the Company's business. *Id*. ("Following the [acquisition], Weber's existing management team will continue to operate Weber's business."). Also, the LLC did, in fact, act as though it had taken over the contract for the Company. R. 215-4 ¶¶ 4-7. It continued for roughly two years to perform on the 1998 agreement as if the agreement had, in fact, been assigned. *Id*.

In sum Weber's "wrong Weber" argument is rejected. At trial, Sears may argue that the Company assigned the contract to the LLC or that the LLC succeeded to the Company's contractual obligations by express or implied agreement.

**2. Damages**

Sears claims two[11] types of damages from Weber's breach of the 1998 agreement's "Parts" provision. First, Sears wants the lost profits it could have had if

---

[11]Sears's principal declarant, a Mr. Alt, appears to claim other types of contract damages in his declaration in opposition to Weber's motion. R. 215-4. He says that "After Weber cut Sears off, Sears was forced to make rough estimates of how many Weber replacement parts it might need in the future and to make one last bulk purchase from [the third party]. Since Sears may never need to use those replacement parts, Sears may get stuck with excess inventory. Further, since Sears was required to make a bulk purchase up front, Sears was deprived of the opportunity cost of using that money elsewhere unless and

17

Weber had continued to let it sell grills. Sears's Resp. Br. at 14. But "[t]he measure of damages is the amount which will compensate the party for loss which either fulfillment of the contract would have prevented, or which breach has caused." *Melrose Park Nat'l Bank v. Carr*, 618 N.E.2d 839, 845 (Ill. App. Ct. 1993) (internal citations omitted). In other words, Sears cannot get damages that have nothing to do with the breach. Here, awarding lost profits based on grills is inappropriate because the alleged breach is of the "Parts" provision, which says nothing about grills. The contract did not require Weber to sell Sears grills at all. Agrmt. at 1 ("Nothing contained herein shall be construed as a commitment by Sears to purchase, or by Seller to supply, any quantity of merchandise"). It only required Weber to sell Sears parts. Agrmt. at 3. Moreover, Sears never pled anything even hinting at damages based on lost grill sales. Sears's Answer and Counterclaims ¶¶ 19-30, 139-47; *Grayson*, 308 F.3d at 817 (rejecting unpled theory raised for first time in opposition to summary judgment).

Second, Sears claims as damages the difference between what it paid on Weber.com for replacement parts and the wholesale cost of those parts. Sears's Resp. Br. at 15. This makes sense. The contract says that Weber had to sell Sears the parts and that they had to sell them, in effect, at wholesale. Agrmt. at 3. Weber did sell Sears replacement parts, and perhaps still does, but it does so at retail. R. 215-4 ¶ 11. Accordingly, Sears—if it proves the other elements of the claim at

---

until needed, as well as the time value of money." *Id.* ¶ 10. Sears's brief, however, nowhere argues these possible damages theories. Accordingly, they are waived.

18

trial—is entitled to these damages. For that reason, Weber's damages argument is rejected.

## V. Conclusion

Weber's summary judgment motion is granted as to Sears's *Walker Process* claim and granted as to Sears's damages theory that Weber's alleged breach of the 1998 agreement entitles Sears to whatever profits it lost when Weber stopped selling it grills. The motion is otherwise denied. Sears may bring its contract claim to trial to recover the difference between what it should have paid for parts under the contract and what it did pay.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: February 24, 2014