# EXHIBIT AA TO SEARS'S RULE 56.1 REPLY ('045)

```
                                                              Page 1
 1             UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3                 CASE NO.: 13-cv-1686
 4
 5   WEBER-STEPHEN PRODUCTS, LLC,
 6        Plaintiff/Counter-Defendant
 7      vs.
 8   SEARS HOLDINGS CORPORATION; SEARS
     ROEBUCK & COMPANY,
 9
             Defendants/Counter-Plaintiffs.
10
11
12
13   _____
                   DEPOSITION OF JAMES M. GANDY
14   _____
15
16
17
18   DATE TAKEN:    Wednesday, April 22, 2015
     TIME BEGAN:    11:10 a.m.
19   TIME ENDED:    4:25 p.m.
     LOCATION:      Constangy, Brooks, Smith & Prophete, LLP
20                  1301 Gervais Street
                    Suite 810
21                  Columbia, South Carolina  29201
22
23
24   REPORTED BY:   Elaine L. Grove-DeFreitas, RPR
```

1   Q   Right.  One of the benefits of 32 years of
2   experience, I suppose.  Right?
3       In '96 when you applied for and were
4   appointed a job as a supervisor, you headed up an
5   Art Unit, what was that Art Unit?
6   A   The Art Unit was 2913.
7   Q   And what is 2913?
8   A   They were -- at the time, there were four
9   Art Units in the Design Technology Center, and they
10  all had a number.  The Technology Center had a
11  number 2900.  All the Technology Centers in the
12  Patent Office are assigned a number, and it's
13  normally based on what the principal -- what the
14  technology is in that particular technology center.
15  So 2900 was the Technology Center for Design
16  Patents.  And the Art Units consisted of 2901, 2902,
17  2903.  I'm sorry.  2911, 2912, 2913 and 2914.  I was
18  the supervisor of 2913.
19  Q   And was 13 a subset of Design Technology
20  within 2900, which was Design?
21  A   Yes.  The art units will -- basically, the
22  Art Units divide up the different classes of
23  technology in the design area.  And so each Art Unit
24  will have either an entire class or portions of a

Page 19

1    class that they have been assigned.
2         Q    Okay.  And then what was 13, specifically,
3    2913?
4         A    There was -- there was Furniture Art.
5    Class D6 was the Furniture Art.  There was some of
6    Class D12, which was Land Transportation, and I
7    actually went on and became a supervisor.  That was
8    the primary area that I examined in, and I was able
9    to bring some of that art to that Art Unit as the
10   new supervisor.
11        Q    You said Transportation?
12        A    Land Transportation.
13        Q    Okay.  And I think some of that is
14   outlined in your report.
15        A    Yes.
16        MR. MCANDREWS:  Why don't we ask the reporter
17   to mark Mr. Gandy's primary report as --
18        MR. GARCIA:  By "primary," you mean the initial
19   one, February 20th?
20        MR. MCANDREWS:  The initial one, yes.  And we
21   will get the date in the record.
22             So and why don't we treat these as a
23   single exhibit.  And for the record, I'm referring
24   to the Expert Report of Jim Gandy.  It looks like it

Page 21

1   A   Yes.
2   Q   And you recognize what has been marked as
3   Gandy Exhibit 2 to be your Rebuttal Report,
4   responding to Mr. Holecek's opinions on
5   infringement.  Is that right?
6   A   Correct.
7   Q   We will refer to this alternatively as the
8   rebuttal report, or the March 24th, 2015 report.  We
9   can just keep these handy.
10      Why don't we finish off with the narrative
11  description of your employment history.  I think
12  where we ended off you were the head or the
13  supervisor of Art Unit 2013, and I think you said at
14  that time you were supervising in the area of
15  Transportation?
16      MR. GARCIA:  Objection, to the extent it
17  misstates the testimony.  Go ahead.
18      MR. MCANDREWS:  That happens sometimes.
19  WITNESS ANSWERS:
20  A   No.  I was the supervisor of 2913, in
21  which there were -- I can't remember exact number of
22  design classes that were assigned to that art unit,
23  but if I look at my report I can probably tell you
24  the ones.  I know, as I said, D6, which is

Page 22

Furnishings, was a major part of that art unit's subject matter. Some of what was D14, which is basically Telecommunications, it was the Phone Art that was in that particular Art Unit. As I indicated, some of D12, which was Transportation, was in that Art Unit. I think it was some of D3, which was Brushware, was part of that -- was part of that Art Unit. Some of D7, which dealt primarily with electronic type recording information, was in that Art Unit. Some of Class D10, I do remember this examiner because I worked with him most of my career, which was Measuring and Testing. And it was basically clocks, watches, you know, in that particular art area.

So there was a number of diverse types of arts that were -- that were assigned to that particular art unit. And, for the record, there was some fluidity to arts that could be moved from Art Unit to Art Unit, depending on what the workload was or needed or what workload might have been needed in an Art Unit. So these were not -- these were not classes that were necessarily permanently going to be assigned to a particular Art Unit. It depended on the workflow that was needed in an Art Unit.

Page 23

1      From time to time I would talk with
2  supervisors in another Art Unit to ask if, you know,
3  I needed some workflow for examiners in my Art Unit,
4  did they have some other areas that they might be
5  able to shift cases to my Art Unit.  And the same
6  thing, if I had art that I had enough workflow for
7  my examiners and a supervisor came to me from one of
8  the other art units and asked that, we had to work
9  those things out.
10     Q   And help out.  So how long did you hold
11  the position of supervisor of Unit 2913?
12     A   About two-and-a-half years.
13     Q   That brings us up to '98, '99?
14     A   Yeah, '98, '99, yes.
15     Q   And then what did you do?
16     A   I was assigned the position of design
17  patent practice specialist.  And effectively, the
18  director of the Technology Center.  What prompted,
19  basically prompted this was the office was rolling
20  out a quality program, a quality assurance program
21  in which they were -- there was some issues being
22  raised in the office about quality of examination.
23  If you're familiar, there have been some issues
24  recently raised about quality of examination.  So

Page 29

1   marked)
2   BY MR. MCANDREWS:
3       Q   So, Mr. Gandy, you have got in front you
4   now Gandy Exhibits 3 and 4.  And do you recognize
5   these to be Weber's asserted design patents in this
6   litigation?
7       A   Yes, I do.
8       Q   And you have provided opinions, with
9   respect to these design patents, in this case?
10      A   Yes, I have.
11      Q   So referring, first, to the face of Gandy
12  Exhibit 3, which is the 834 Design Patent, if we
13  look in the upper left-hand corner and we see a
14  reference item 52 in parentheses, do you see that?
15      A   Yes.
16      Q   Okay.  What does this line describe, this
17  line of the 834 patent?
18      A   It describes where this patent has been
19  allowed, what class and subclass that it has been
20  allowed in.
21      Q   And it says D7 there.
22      A   Correct.
23      Q   Is that the same D7 to which you refer on
24  page 3 of your report of Gandy Exhibit 1?

Page 30

1      A    Yes, it is.

2      Q    Okay. Now, during your time examining, in
3 any of the classes with which you work, did you ever
4 examine an application for a barbecue grill shroud?

5      A    I don't believe so.

6      Q    Nothing comes to mind?

7      A    No. No. I do know I had looked at the
8 PTO website for my name and design patents that I
9 had issued. I had issued -- I found at least one
10 that I had issued that was a grill subject matter,
11 but it wasn't a shroud.

12      Q    So nothing for a barbecue grill shroud.
13 And when you say you looked at the PTO website, you
14 did that recently?

15      A    Yes.

16      Q    Okay. In connection after you were
17 retained by Mr. Garcia's law firm?

18      A    Yes.

19      Q    You wanted to see if, in fact, you had
20 handled anything during your time at the PTO that
21 pertains to the subject matter, the 834 and the 045
22 patents?

23     MR. GARCIA: Object to the form.

24 WITNESS ANSWERS:

Page 90

1  certain portions disclaimed by way of broken lines.
2     Q    By way of the dotted lines.
3     A    Right.
4     Q    And subject to that caveat, or that
5  explanation, you would agree that the 045 patent
6  covers a barbecue grill design, as a whole?
7     A    Yes.
8     Q    Let's go to page 8.  You know what?  I
9  think I can short-circuit this.  Let's go to a fun
10 one.  Let's go to page 9 of Gandy Group Exhibit 5.
11 And this is, again, our triple-play series.  We have
12 got, on the left-hand side, Figure 1 of the 045
13 patent.  In the center we have got the Accused
14 Kenmore Elite, a digital image of that, or a
15 photograph, if you will.  And on the right we have
16 got one of the isometric drawings from the Home 357
17 patent.  Let me ask you to circle on page 9, which
18 of these two designs are most similar.
19     MR. GARCIA:  Objection, assumes facts not in
20 evidence, and it's just an infirmed question, form.
21 WITNESS ANSWERS:
22    A    Well, let's put it to you this way.  I
23 don't consider any of these three grills to be that
24 similar to each other.  If you're going to say,

Page 101

1   A   I don't think I could agree with that.  I
2   would doubt that seriously.
3   Q   Let's take a look at Gandy Exhibit 6, and
4   specifically, the document page 4, which that's
5   easier for your reference.  I will refer, for the
6   record, to Bates number PERMA dash 03585.  Are you
7   with me?
8   A   Yes.
9   Q   It's a grill parts diagram.
10   A   Yes.
11   Q   And if we refer to the uppermost part of
12   the parts diagram, we will see what we were
13   referring to as the grill shroud.  Right?
14   A   Correct.
15   Q   And you will see that there are five of
16   the elements along each of the bands, or at least to
17   what we have been referring as the bands in this
18   drawing.  You have identified these as raised
19   protrusions, and yet, at least in this parts
20   diagram, those are not indicated to be fasteners,
21   are they?
22   MR. GARCIA:  Object to the form.
23   WITNESS ANSWERS:
24   A   There is certainly no indication as to

Page 102

1  what they are.
2       Q    One way or another.  They are not pieces
3  that are assembled as part of the grill parts
4  diagram.  Is that right?
5       MR. GARCIA:  Object to the form.
6  WITNESS ANSWERS:
7       A    When you say pieces, I'm not following
8  what you're saying.
9       Q    Tell me what we are seeing on page 4.
10      A    Well, I think what you're seeing on page 4
11 would be not -- it would not be unreasonable to
12 presume that they are some form of fasteners, and
13 that it wouldn't necessarily be unreasonable, based
14 on the figure on the front cover, that they actually
15 have some depth to them.
16      Q    You're making an assumption, based on the
17 design on the front cover.
18      MR. GARCIA:  Objection, asked and answered,
19 form.
20 WITNESS ANSWERS:
21      A    I'm not making an assumption at all.  In
22 view of the photograph that I saw of this grill,
23 that my understanding is of record in this case.
24 And I would indicate that because there might be

Page 103

1  some doubt about the BBQ, that's one of the reasons
2  why I also include the PERMA, because there is no
3  doubt, based on the photograph that I saw of the
4  PERMA.
5      Q   On the issue of the BBQ reference, what is
6  disclosed there could also be recessed fasteners,
7  could they not?
8      MR. GARCIA:  Objection, asked and answered.
9  WITNESS ANSWERS:
10     A   I would not read that at all into that
11 drawing.
12     Q   No?
13     A   No.
14     Q   I mean, am I seeing it correctly on the
15 left-hand side of page 11 of your report, they
16 appear to be black dots?
17     A   That's correct.
18     Q   Five of them on each band.  Right?
19     A   That's correct.
20     Q   Is that right?  Five of them.  And it's
21 your testimony that that could not be a recessed,
22 cylindrical hole into which a fastener is affixed?
23     A   Based on the image that I saw on the
24 instruction manual for this, I could not read that

Page 104

1    as being the case from the instruction manual.
2    Again, this view is on a smaller scale than that, so
3    you lose some of the -- some of what you could see
4    better in the large view of that from the manual.
5         Q    Okay.  I'm referring to Gandy Exhibit 3,
6    which I think you have got in front of you.  This is
7    just the cover page of the 834 patent.  You
8    certainly don't see, in the barbecue reference, the
9    dimension, the upward dimension to the protrusions
10   that you see in the shroud design of the 834 patent,
11   do you?
12        MR. GARCIA:  Object to the form, foundation.
13   WITNESS ANSWERS:
14        A    No, you don't.  You don't see it.
15        Q    And you do clearly see that upward
16   dimension in the 834 design.  Right?
17        A    Yes.
18        Q    So if you turn to page 12 of your primary
19   report, Gandy Exhibit 1, and just up at the very
20   top -- well, strike that.  Mid-page, you -- on the
21   left-hand side, what you have done is you have
22   assembled various elements of prior art references
23   into what you refer to as a modified side panel or
24   modified side panels of the Home 357.  Do you see

Page 109

1 ahead.
2 WITNESS ANSWERS:
3    A    That's correct.
4    Q    And it is also your opinion that those two
5 drawings, the 834 and the 357, are much closer, in
6 overall shape and appearance, than are either to the
7 Kenmore Elite Grill?
8    MR. GARCIA:  Objection, asked and answered.  Go
9 ahead.
10   A    That's correct.
11   Q    Let's go to page 9 of Gandy Group Exhibit
12 5.  I don't think I asked you this before.  This, by
13 the way, is Figure 1 of the 045 patent on the
14 left-hand side.  It appears to be an unedited
15 drawing, isometric view of the grill design of the
16 357 patent on the right-hand side, and we have got a
17 digital image, or a photograph of the Accused
18 Kenmore in the middle.  Is it your testimony that
19 the 045 design on this page and the 357 are
20 basically the same?
21   MR. GARCIA:  Objection, asked and answered
22 earlier.
23 WITNESS ANSWERS:
24   A    No.

Page 110

1    Q    Is it your testimony that the 045 and 357
2    designs on this page are much closer, in overall
3    shape and appearance, than are either to the design
4    of the Accused Kenmore Elite, as shown on this page?
5         MR. GARCIA:  Objection, asked and answered
6    extensively before the lunch break.
7    WITNESS ANSWERS:
8         A    I didn't say much closer.  What I said is
9    I don't consider any of these three grills to be
10   that close to each other.  You asked me, though, to
11   circle the two I thought that were most closest to
12   each other, and that's what I did.
13        Q    I didn't ask you if they were much closer
14   in overall appearance?
15        A    I don't recall you asking me if they were
16   much closer.  All I recall you asking me is which of
17   the two on this page would you consider to be closer
18   to each other.
19        Q    Right.  So I didn't extensively ask you
20   about much closer, did I?
21        MR. GARCIA:  Objection.  The record will speak
22   for itself.
23   WITNESS ANSWERS:
24        A    That's right.

Page 151

1    A    That's correct.
2         MR. MCANDREWS:  All right.  Nothing further,
3    Mr. Gandy.  Thanks for your time.
4         MR. GARCIA:  Do you mind if I ask a couple,
5    Matt?
6                       EXAMINATION
7    BY MR. GARCIA:
8    Q    Mr. Gandy, Mr. McAndrews asked you some
9    questions throughout the day about your use of
10   portions of prior art grills in your 103 analysis of
11   the 834 patent.  Do you recall the questions?
12   A    Yes.
13   Q    How many times, in your career, have you
14   performed a 103 analysis of a design, sir?
15   A    How many times have I rejected a design
16   claim based on 35 USC --
17   Q    No, sir.  My question is more general.
18   How many times have you done the analysis under 103
19   for a design, in your career, ballpark?
20   A    Every application I ever examined, which
21   would be, to the best of my knowledge, over 10,000.
22   Q    And in the times that you have performed
23   that analysis, Mr. Gandy, you looked to the prior
24   art.  Is that right?

Page 152

1    A    That's correct.
2    Q    And in your experience in performing that
3    analysis, and it's more than 10,000 times, is it
4    common to use portions of prior art designs to
5    determine whether or not a design should be
6    rejected?
7    A    That's correct.  Can I expand?
8    Q    Please.
9    A    One of the things I corrected
10   Mr. McAndrews earlier about was, when he was
11   referencing one of the prior art -- I think it might
12   have been the Coleman, he said the Coleman
13   disclosure, and it's the claimed design.  There is a
14   difference between claimed subject matter and
15   disclosure in a patent application, both utility and
16   design.  And a reference, a prior art reference is
17   available for whatever it shows.  So whatever is in
18   the disclosure of a design patent application or a
19   utility patent application is available as prior art
20   to show obviousness in the 35 USC 103.
21   Q    So, specifically, here you used, for
22   example, the shroud portions of the Home 357 Grill
23   claimed in the patent.  Correct?
24   A    That's correct.

Page 164

CERTIFICATE

I, the undersigned, Elaine L. Grove-DeFreitas, RPR, Notary Public, in and for the State of South Carolina, do hereby certify that the foregoing deposition of James M. Gandy was taken on the 22nd day of April 2015.

That the within deponent was sworn to tell the truth, and that the foregoing is an accurate transcription of the testimony taken under oath.

That all exhibits entered herein are attached hereto and made a part of this deposition.

I further certify that I am neither counsel nor solicitor to any of the parties in said suit, nor interested in the event of the cause.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 26th day of April 2015.

Elaine L. Grove-DeFreitas, RPR
Notary Public for South Carolina
My Commission Expires: 6-25-2020