UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WEBER-STEPHEN PRODUCTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 01686 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| SEARS HOLDING CORPORATION and | ) | |
| SEARS, ROEBUCK & CO., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I. Introduction

Weber-Stephen Products LLC makes and sells Weber grills. Sears Holding Corporation and Sears, Roebuck & Company own and operate retail and online stores.[1] Sears also makes and sells its own grills under the Kenmore brand name. Sears sold Weber's grills too until Weber stopped supplying Sears in 2012. Not long after that, Weber sued Sears, alleging, among other things, that some of Sears's Kenmore grills infringe on Weber's product-design trade dress.[2] The gist of this claim is that, by copying Weber's trade dress, Sears is trying to pass off its grills as Weber's and thereby use Weber's good reputation to sell more Sears grills.

---

[1]This Opinion will refer to the two Defendants collectively as Sears.

[2]The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a) & (b), 2201, 2202, and 1367(a). Docket citations are noted as "R." followed by the docket number and the page or paragraph number.

Sears wants summary judgment on this claim because, it says, Weber cannot prove one of the claim's elements—secondary meaning. Trade dress has secondary meaning if the public associates the trade dress with a specific manufacturer. If, for example, the public looks at Weber's trade dress and thinks, reflexively, "this grill must be a Weber," then the trade dress has secondary meaning. That this is an element of a trade-dress infringement claim makes sense given that trademark law exists to prevent consumer confusion about who made which goods. If—and only if—trade dress sends a signal as to the product's source does protecting trade dress prevent confusion about source.

In this case, Weber has enough evidence to allow a reasonable jury to conclude that its trade dress has acquired secondary meaning. Weber's evidence shows that consumers were exposed to its trade dress via *tens of millions* of dollars in advertising and via sales of around 1,400,000 units of the grills. This exposure gave the public the opportunity to make the connection between Weber and its trade dress. And there is limited anecdotal evidence that the public actually did make the connection.

Weber's strongest evidence, however, consists of emails and other documents showing that Sears intentionally copied Weber's trade dress. According to an email authored by a Sears Product Manager, Sears designed its Kenmore Elite grills hoping that consumers would look at them and "think of the market share leader, Weber." R. 288-5, Weber Exh. E, Kobrick/Ostrom Emails.. Copying like this is strong evidence of secondary meaning because the only reason that Sears would

have expected copying Weber to make consumers think of Weber is if, in fact, Sears believed that Weber's trade dress had acquired secondary meaning. This copying evidence, taken together with Weber's other evidence, is enough to warrant a trial.

## II. Background

### A. The 2007 Genesis Redesign

Weber-Stephen Products LLC is in the grill business. R. 285, Mem. Op. and Order at 2. It designs, develops, manufactures, and provides outdoor gas, charcoal, and electric grills and grilling accessories under the Weber brand name. *Id*. In 2007 "Weber introduced a new look to its Weber Genesis and Summit [gas] grill lines, after significant time, money and energy was spent to design a new, distinctive appearance for the grills." R. 288-1, Weber Exh. A, Kempster Decl. ¶ 7. That 2007 redesign introduced the trade dress at issue in this case, including "(1) metal bands bordering the edges of the grill shroud with exposed rivets/fasteners; (2) shiny door edges on the grill cart; (3) shiny horizontal tubular handles for the door and lid handles; and (4) product logo in the lower right corner of the side table." *Id*. ¶ 8; R. 138, Am. Compl. ¶ 70. Since 2007, Weber has used this trade dress on its Genesis and Summit grills continuously. Kempster Decl. ¶ 9. From 2007 to 2012, Weber's grills were the only grills sold with this trade dress (2012 is when the allegedly infringing Sears Kenmore grills entered the market). *Id*. ¶¶ 1-6 (foundation), 7, 20, 22.

## B. Exposure to the Trade Dress

Since the time that the trade dress was introduced in 2007, consumers have been exposed to it relentlessly through huge amounts of advertising and sales. Between 2007 and 2012, Weber spent $59,000,000 on advertising and promoting its two lines of grills bearing the trade dress. *Id.* ¶ 10. Weber's retailers, like Lowes and Home Depot, also advertised the grills bearing the trade dress. *Id.* ¶ 12. Even Sears advertised those Weber grills, before the companies parted ways in 2012. *Id.* ¶ 16.

The advertising came in many forms. Ads appeared in magazines and in newspapers and on billboards and on television. *Id.* ¶ 11. The ads "always prominently display[ed] the Weber Trade Dress … ." *Id.* ¶ 13. (For example:



*Id.* ¶ 14 & Exh. A.) Advertising like this put the trade dress and the Weber name together in front of the public. *Id.* This gave rise to the possibility that consumers would draw a connection between the trade dress and Weber.

Consumers were also exposed to the Weber trade dress by the grills themselves. Shoppers would see the grills, which are usually displayed for sale fully assembled. *Id.* ¶ 19. And, between 2007 and 2012, Weber sold $949,000,000 worth of

4

grills bearing its trade dress—including both Genesis and Summit grills. *Id.* ¶ 9. By the time Sears introduced its allegedly infringing grill in 2012, Weber had already sold more than 1,400,000 Genesis grills. R. 304-1, Exh. A., Historical Genesis Figures; R. 304-3, Exh C, Various Sales Figures. These grills, by their very presence in the backyards and on the patios of their owners, exposed more of the public to the trade dress. Kempster Decl. ¶ 18.

### C. The Public—and Sears—Connects Weber to the Trade Dress

All of this exposure gave an ample opportunity to the public to associate the trade dress elements with Weber. And there is evidence that they did. At least one consumer came to be able to "identify Weber as the source of the Genesis product simply from its appearance, particularly the riveted band on each side of the lid." R. 288-3, Weber Exh. C, West Decl. ¶ 9. This same consumer later bought a Kenmore grill thinking—because of its appearance—that it was made by Weber. West Decl. ¶¶ 1-10. At least one retailer also came to associate the trade dress with Weber, believing—because of the grill's appearance—that a Kenmore grill was actually made for Sears by Weber. R. 288-4, Weber Exh. D, Ralph Decl. ¶¶ 1-11. This retailer called Weber to complain that Weber was making grills for Sears—a competitor—but not for him. *Id.*

This confusion might well have been what Sears was intentionally trying to accomplish (or at least a reasonable jury can so find). When Sears redesigned its Kenmore Elite series, Sears copied Weber—and only Weber—no other competitors were used for inspiration. R. 288-2, Weber Exh. B., Kobrick Dep. at 194:5-19;

5

R. 288-7, Weber Exh. G, Hu Email; R. 288-8, Weber Exh. H, Fillion/Dykes Emails. Christopher Kobrick, Sears's "Product Manager" for "Kenmore Gas Grills," even called the allegedly infringing grill the "Weber Killer." R. 288-10, Weber Exh. J, Weber Killer Email ("Do you have bigger, clearer renderings of the Weber Killer grills you are working on?"). Kobrick's team even obtained a Weber Genesis grill to use as a model. Kobrick Dep. at 169:6-13.

Sears copied, in detail, many aspects of the Weber Genesis's look, including the trade dress elements at issue in this case. Sears copied the rivets on the hood. Am. Compl. ¶ 58 (photographs). (When the Sears grill was released it and the Weber Genesis grills were the only two gas grills that "use[d] rivets on the left and right side trip pieces." Kobrick Dep. at 184:19-185:5; Kempster Decl. ¶ 22.) Sears copied the placement of the product name. Kobrick Dep. at 190:2-17 (from a Sears email: "The name would sit on the console much like Genesis and Spirit do on Weber grills."); R. 288-13, Weber Exh. M, Name Placement Emails. Sears even went from four screws to two on the new grill's "tank gauge" because that was what Weber had. R. 288-9, Weber Exh. I, Hu/Kobrick Emails. Sears tried to copy Weber's ceramic ignition switch covers but, apparently, could not find a supplier. R. 288-11, Weber Exh. K, Ignition Switch Emails.

The result was a visual similarity between the Weber Genesis grills and their accused Kenmore counterparts, a similarity that a reasonable jury could find striking:

6


Weber Genesis® S310


Kenmore Elite Stainless Grill


Weber Genesis® S330


Kenmore Elite Espresso Grill

Am. Compl. ¶ 58.

There is substantial evidence that the purpose of Sears's copying was to pass-off the Kenmore grills as Weber-made. Once again, there is evidence from Kobrick, who put it this way: "[Sears has] developed a model to directly compete with Weber's best-selling model, the 699 Weber Genesis. We spec'd the features exactly the same, improved the materials and construction and created a grill that the fit, feel and finish will make the customer think of the market share leader, Weber, but at a lower price." Kobrick Dep. at 89:8-21, 94:8-16; Weber Exh. E, Kobrick/Ostrom Emails. Of course, if Sears did not believe that consumers had come to associate the look of Weber's grills with Weber, then Sears would not have expected its competing grill, based on its looks, to "make the customer think" of Weber. Thus, an underlying assumption of Sears's copying was that Weber's trade dress had acquired secondary meaning.

### D. Weber Sues

Following the release of the Kenmore grills, Weber sued Sears for trade dress infringement. Am. Compl. ¶¶ 55-74. Weber alleges that Sears designed its Kenmore Elite 500, 550, 600, and 700 Series Gas Grills to intentionally "create the same overall visual effect and appearance as the family of grills in Weber's Genesis Line," and more specifically, that doing so infringed on the four trade-dress elements listed above. *Id.* ¶¶ 57, 70. Sears moved once before for summary judgment on this claim. R. 199, Mot. Summ. J. But Weber asked for time to complete expert discovery, R. 205, Rule 56(d) Mot., which the Court granted, terminating Sears's first motion without prejudice, R. 210. Following expert discovery, Sears filed this, its renewed motion. R. 264, Renewed Mot. Summ. J.

### III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2). The party seeking summary

judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### IV. Analysis

Section 43(a) of the Lanham Act makes "liable in a civil action" "[a]ny person who, on or in connection with any goods or services … uses in commerce any … symbol, or device, or any combination thereof … which … is likely to cause confusion … as to the affiliation, connection, or association of such person with another person … ." 15 U.S.C. § 1125(a)(1)(A). This text prohibits infringement of trade dress (even if it is not registered with the Trademark Office). *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28-29 (2001). To make a case for tradedress infringement, the plaintiff must show that the allegedly infringed trade dress is non-functional, 15 U.S.C. § 1125(a)(3); "that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products," *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998) ("*Betts II*"); and, if the trade dress claim is based on the product's design (like Weber's is), that the trade dress has acquired secondary meaning, *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 213 (2000).

9

This motion turns on the third requirement—secondary meaning. The term[3] "is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766, n.4 (1992) (internal citations and quotations omitted). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." *Id.* "Secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market[,] and proof of intentional copying." *Betts II*, 138 F.3d at 291 (internal quotation marks omitted). Intentional copying, though, "is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995) (*Betts I*). Sears argues that Weber cannot show secondary meaning up to the summary judgment standard.

Sears's motion is denied. Relying on the proffered evidence, a reasonable jury could conclude that Weber's trade dress acquired secondary meaning. Weber's evidence shows that the public was exposed—in a massive way—to Weber's trade dress over a five-year period of sales of the grills and advertisements for them.

---

[3]"The phrase 'secondary meaning' originally arose in the context of word marks, where it served to distinguish the source-identifying meaning from the ordinary, or 'primary,' meaning of the word. 'Secondary meaning' has since come to refer to the acquired, source-identifying meaning of a non-word mark as well. It is often a misnomer in that context, since non-word marks ordinarily have no 'primary' meaning." *Wal-Mart Stores*, 529 U.S. at 211, n.*.

Kempster Decl. ¶¶ 1-17, 19-20, 22; Historical Genesis Figures; Various Sales Figures. During those five years, Weber's grills were alone in bearing that dress. Kempster Decl. ¶¶ 7, 20, 22. This public-exposure evidence demonstrates that the public had ample opportunity to draw the connection between the trade dress and Weber. What allows a reasonable jury to conclude that the public actually did draw that connection are two things: (1) the West and Ralph declarations are "direct consumer testimony";[4] and (2) the evidence that Sears copied Weber's trade dress with an eye toward passing off its grills as Weber's. Kobrick Dep. at 89:8-21, 94:8-16, 169:6-13, 184:19-185:5, 190:2-17, 194:5-19; Am. Compl. ¶ 58 (photographs); Hu/Kobrick Emails; Ignition Switch Emails; Name Placement Emails; Weber Killer Email; Hu Email; Fillion/Dykes Emails; Kobrick/Ostrom Emails.

This evidentiary formula—evidence of exposure plus evidence of connection—is what led *Betts II* to reverse the district court's grant of summary judgment, based on secondary meaning, to the trade-dress owner in that case. *Betts II*, 138 F.3d at 292-96. To show exposure to the buying public, the trade-dress owner in *Betts II* had 10 years of exclusive-use of the trade dress, as well as advertising. *Id.* And, for connection, the trade-dress owner had anecdotal declarations and two (somewhat flawed) consumer surveys. *Id.* Here, Weber has five years of an extraordinary amount of sales and advertising coupled with a pair of declarations. *See id.* at 295 ("[F]ive years' use weighs strongly in favor of secondary meaning."). Plus, Weber even has something that the *Betts II* owner did not: evidence of intentional copying.

---

[4]Ralph is not, strictly speaking, a consumer. Sears's objection on this score, however, goes to the weight, not the admissibility, of his declaration.

11

Evidence of intentional copying is a well-established basis to prove secondary meaning. "Evidence that [the] defendant knowingly imitated or copied plaintiff's symbol has long been regarded as … probative of the existence of secondary meaning." McCarthy on Trademarks and Unfair Competition § 15:38 (4th ed., 2015). Indeed, once intentional copying is shown, some Circuits (though not this one) even shift the burden over to the defendant to *dis*prove secondary meaning. *Id.* (collecting Fourth and Sixth Circuit cases). And at least one Circuit reasoned that a defendant's admission of copying with the intent to pass-off—one could reasonably construe Sears's Product Manager's statement here as just that—was an *admission* of secondary meaning. *Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988) ("Defendant … stated that he continued to use the … logo because [Plaintiff] had a reputation for quality products and he believed people might associate that reputation with [Defendant's] products. These statements by the defendant constitute an admission that the … trademark has secondary meaning.") (internal citations omitted). That decision affirmed summary judgment *for the plaintiff*. *Id.*

Thus, Sears's motion falls short. Indeed, Sears seeks summary judgment on an evidentiary record that, in one Circuit, would either give summary judgment to *Weber* and, in others, at least warrant a trial. And nothing in Seventh Circuit case law allows this Court to set aside the importance of intentional copying. It is worth noting that many of the Seventh Circuit cases affirming summary judgment for defendants on secondary meaning are cases without intentional copying evidence. *See, e.g.*, *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992); *Echo*

12

*Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989) ("[N]o evidence of intentional copying was offered."); *Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 907-08 (7th Cir. 1983).

That shows that Sears's reliance on cases like these is misplaced. And Sears's other arguments are insufficient, alone or in combination, to support a different result. First, Sears argues that Weber's failure to submit a consumer survey is fatal because, according to Sears, one cannot prove secondary meaning without one. R. 265, Sears's Br. at 13 ("[A] trademark plaintiff's failure to submit [a survey] can be dispositive."); Sears's Reply Br. at 8. This argument relies on a nonexistent rule. The Seventh Circuit has never said what Sears says. Indeed, although the Seventh Circuit has not explicitly rejected Sears's argument, it has come close. It has held that no survey is necessary to show a likelihood of success on secondary meaning under the preliminary injunction standard. *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 728-29 (7th Cir. 1998) (holding failure to submit survey "not fatal"); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir.1988) ("[W]e are not persuaded that the absence of a consumer survey is *per se* fatal."). And the Sixth Circuit has twice explicitly held that surveys are not necessary to defeat a summary judgment motion. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 639-40 (6th Cir. 2002) (relying primarily on intentional copying to reverse summary judgment on secondary meaning); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 315-16 (6th Cir. 2001) ("[C]onsumer surveys, while helpful, are not a

13

prerequisite to establishing secondary meaning.") (citing *Int'l Kennel Club*, 846 F.2d at 1087). On the strength of this contrary authority, Sears's argument is rejected.

Next, Sears argues that the sales and advertising figures Weber relies on here were asked for in discovery but never disclosed. Sears's Reply Br. at 17. This argument is rejected for two reasons. First, Sears alleges a discovery violation but then does not identify a particular request and a particular response. Without that, the Court cannot meaningfully evaluate the argument. Second, Weber appears to have disclosed the information. The documents it filed in response to Sears's accusation have Bates numbers on them (indicating that they likely were produced) and, as Weber explains, Sears appears to have relied on at least some of this information in its own summary judgment papers related to its monopolization claim. R. 304, Weber's Mot. to Strike at 3-4.[5] What appears to have happened is that Weber, in discovery, produced to Sears raw numbers in various reports but then, on summary judgment, distilled them into a declaration. No discovery violation there.

All of Sears's remaining arguments fail because they ignore basic tenets of summary judgment practice: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … ruling on a motion for summary judgment … . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

---

[5]The Court has reviewed the briefs and evidence submitted by both parties in connection with Weber's Motion to Strike, R. 304. The motion is denied because the Court has chosen to treat the briefs as sur-replies (which, judging by their content, they appear to be).

14

his favor." *Anderson*, 477 U.S. at 255. Sears's arguments would have the Court violate all of these rules.

First, Sears argues that its consumer survey must be believed. Sears hired Hal Poret to conduct a consumer survey—that is, to go out and ask a statistically significant number of people whether they actually do associate the Weber trade dress with Weber. R. 266-1, Exh. 1, Poret Report. Poret's survey finds that they do not.[6] *Id.* at 27. Sears believes that this is "game, set, and match on Weber's claim of infringement." Sears's Br. at 15. But Weber actually has a successful return of service: the Court is required to "believe[]" Weber's contrary circumstantial evidence, draw all "justifiable inferences" in Weber's favor, and then ask whether the sum of that evidence and those inferences would allow a reasonable jury to find in Weber's favor. *Anderson,* 477 U.S. at 255. It cannot, as Sears asks, disbelieve all of Weber's evidence and simply credit Poret.[7]

Next, Sears makes two more arguments that would require this Court to disbelieve Weber's evidence and credit Sears's contrary evidence. First, Sears argues that Weber did not use the trade dress continuously for five years because it

---

[6]Weber argued that the Poret evidence is inadmissible because it is unsigned. R. 287, Weber's Resp. Br. at 14. This argument relies on the old version of Rule 56, which required that, to be considered on summary judgment, evidence had to be presented in a form that would be admissible at trial. *See generally Foreword Magazine, Inc. v. OverDrive, Inc.*, 2011 WL 5169384, at *1-3 (W.D. Mich. Oct. 31, 2011) (explaining amendment). The rule has since been amended to allow consideration of evidence so long as that evidence "can[] be presented in a form that would be admissible in evidence [at trial]." *Id.*; Fed. R. Civ. P. 56(c)(2). Under the new rule, the proper objection on summary judgment is that the evidence cannot be presented at trial in an admissible form. *Id.* Weber has not made this objection.

[7]The majority of the briefing and evidence on this motion is devoted to what *weight* the Court should give Poret's survey. But that is a matter for the jury. *Anderson*, 477 U.S. at 255.

15

changed the design of its grills in 2010. Sears's Br. at 18. Contrary evidence from Weber refutes that argument (at least a reasonable jury could so find). Kempster Decl. ¶ 9. Next, Sears's relies on a declaration from Hazel Hu, among other things, to argue that other grills bore the Weber trade dress before 2007 or to 2012. Sears's Reply Br. at 16-17. This evidence could take away from Weber's five years of exclusive use and intentional copying arguments. But, because there is contrary evidence that a reasonable jury could credit on both these points, Kempster Decl. ¶¶ 7, 20, these arguments are rejected. The Court cannot decide which evidence to believe. That is the jury's job.

Sears's next two arguments both fail because they ask the Court to draw inferences against Weber. First, Sears asks the Court to infer from various facts that Weber conducted a consumer survey, realized that the survey hurt their case, and then buried it. Sears's Br. at 13. At the summary-judgment stage, the Court cannot indulge in that series of inferences against Weber. *Anderson* expressly forbids the Court from drawing inferences against non-movants like Weber. 477 U.S. at 255. Similarly, Sears points out that Weber only offered two declarations on actual confusion and asks the Court to infer that, because Weber could only find a measly two declarations in spite of all its advertising and sales, its trade dress has not acquired secondary meaning. Sears's Reply Br. at 12. Again, the Court cannot draw inferences against Weber. *Anderson*, 477 U.S. at 255.

Finally, Sears's makes a vague argument based on two Supreme Court cases. Sears's Br. at 2; Sears's Reply Br. at 2-3. *TrafFix Devices* says that "[t]rade dress

protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." 532 U.S. at 29. It resolved, in the negative, the question "whether the existence of an expired utility patent forecloses the possibility of the patentee's claiming trade dress protection in the product's design." *Id*. at 28-30. And *Wal-Mart* says "[i]n the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist." 529 U.S. at 213. It held that product-design plaintiffs must show secondary meaning, rather than rely on other ways of showing "distinctiveness" (which is, basically, synonymous with eligibility for trademark protection). 529 U.S. at 216. Based on these two pronouncements, Sears says that *Betts II* is no longer good law; that, after *Wal-Mart* and *TrafFix*, the test for secondary meaning in product-design trade-dress cases should be harder than it was in *Betts II*. Sears's Reply Br. at 2. This argument is rejected because neither case even dealt with the issue for which *Betts II* is relevant here, which is how much evidence of secondary meaning is necessary to get past summary judgment, much less overruled the case on that point. *Betts II* is still binding and it applies in Weber's favor.

## V. Conclusion

Sears's motion for summary judgment, R. 264, is denied. Weber's motion to strike, R. 304, as explained above in footnote 5, is also denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 1, 2015