WEBER-STEPHEN PRODUCTS LLC,    )
                                     )
           Plaintiff,                 )      No. 13 C 01686
                                       )
           v.                       )
                                       )      Judge Edmond E. Chang
SEARS HOLDING CORPORATION and    )
SEARS, ROEBUCK & CO.,             )
                                       )
           Defendant.            )

## MEMORANDUM OPINION AND ORDER

## I. Introduction

Weber-Stephen Products LLC makes and sells Weber grills. Sears Holding Corporation and Sears, Roebuck & Company own and operate retail and online stores.[1] Sears also makes and sells its own grills under the Kenmore brand name. Sears also sold Weber's grills until Weber stopped supplying Sears in 2012. Not long after that, Weber sued Sears, alleging, among other things, that some of Sears's Kenmore grills infringe Weber's product-design trade dress.[2] The gist of this claim is that by copying Weber's trade dress, Sears is trying to pass off its grills as Weber's and thereby use Weber's good reputation to sell more Sears grills.

---

[1]This Opinion will refer to the two Defendants collectively as Sears.

[2]The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a) & (b), 2201, 2202, and 1367(a). Docket citations are noted as "R." followed by the docket number and the page or paragraph number.

Sears wants summary judgment on this claim because, it says, Weber cannot prove one of the claim's elements—a likelihood of confusion. To prove this, Weber must have evidence that would allow a reasonable jury to conclude that Sears's alleged use of its trade dress is likely to confuse consumers into thinking that Sears's grills have some affiliation with Weber. Sears says that Weber does not have enough evidence to show that. But Weber does: a reasonable jury could rely, among other things, on the striking similarity between Weber's grills (including the trade dress) and Sears's grills, the substantial evidence that Sears copied Weber's look, and Weber's creditable (though certainly not dispositive) evidence of actual confusion.

## II. Background

This is Sears's second summary judgment motion on Weber's trade dress claim. *See* R. 419, Secondary Meaning Order. The last motion, which was denied, targeted a different element of the claim, secondary meaning. *Id*. at 1. The factual records on the two motions substantially overlap because they target the same claim and because some of the evidence relevant to secondary meaning—in particular the evidence on Sears's intent and actual confusion—is also relevant to likelihood of confusion. Accordingly, this background section draws (heavily) from the prior opinion. Of course, all inferences must and have been drawn in Weber's favor, as the non-movant.

## A. The 2007 Genesis Redesign

Weber-Stephen Products LLC is in the grill business. R. 285, Mem. Op. and Order at 2. It designs, develops, manufactures, and provides outdoor gas, charcoal, and electric grills and grilling accessories under the Weber brand name. *Id*. In 2007, "Weber introduced a new look to its Weber Genesis and Summit [gas] grill lines, after significant time, money and energy was spent to design a new, distinctive appearance for the grills." R. 288-1, Weber Exh. A, Kempster Decl. ¶ 7. The 2007 redesign introduced the trade dress at issue in this case, including "(1) metal bands bordering the edges of the grill shroud with exposed rivets/fasteners; (2) shiny door edges on the grill cart; (3) shiny horizontal tubular handles for the door and lid handles; and (4) product logo in the lower right corner of the side table." *Id*. ¶ 8; R. 138, Am. Compl. ¶ 70. Since 2007, Weber has used this trade dress on its Genesis and Summit grills continuously. Kempster Decl. ¶ 9. From 2007 to 2012, Weber's grills were the only grills sold with this trade dress (2012 is when the allegedly infringing Sears Kenmore grills entered the market). *Id*. ¶¶ 1-6 (foundation), 7, 20, 22.

## B. Exposure to the Trade Dress

Since the time that Weber's trade dress was introduced in 2007, consumers have been exposed to it relentlessly through huge amounts of advertising and sales. Between 2007 and 2012, Weber spent $59,000,000 on advertising and promoting its two lines of grills bearing the trade dress. *Id*. ¶ 10. Weber's retailers, like Lowes and

Home Depot, also advertised the grills bearing the trade dress. *Id.* ¶ 12. Even Sears advertised those Weber grills before the companies parted ways in 2012. *Id.* ¶ 16.

The advertising came in many forms. Ads appeared in magazines and newspapers and on billboards and television. *Id.* ¶ 11. The ads "always prominently display[ed] the Weber Trade Dress … ." *Id.* ¶ 13. For example:



*Id.* ¶ 14 & Exh. A. Advertising like this put the trade dress and the Weber name together in front of the public. *Id.*

Consumers were also exposed to the Weber trade dress by the grills themselves. Shoppers would see the grills, which were usually displayed for sale fully assembled. *Id.* ¶ 19. And between 2007 and 2012, Weber sold $949,000,000 worth of grills bearing its trade dress—including both Genesis and Summit grills. *Id.* ¶ 9. By the time Sears introduced its allegedly infringing Kenmore Elite grills in 2012, Weber had already sold more than 1,400,000 Genesis grills. R. 304-1, Exh. A., Historical Genesis Figures; R. 304-3, Exh C, Various Sales Figures. These grills, by their very presence in the backyards and on the patios of their owners, exposed more of the public to the trade dress. Kempster Decl. ¶ 18.

### C. The Public—and Sears—Connects Weber to the Trade Dress

All of this exposure gave the public an opportunity to associate the trade dress elements with Weber. At least one consumer identified "Weber as the source of the Genesis product simply from its appearance, particularly the riveted band on each side of the lid." R. 288-3, Weber Exh. C, West Decl. ¶ 9. This same consumer later bought a Kenmore grill thinking—because of its appearance—that it was made by Weber. West Decl. ¶¶ 1-10. At least one retailer also came to associate the trade dress with Weber, believing—because of the grill's appearance—that a Kenmore grill was actually made for Sears by Weber. R. 288-4, Weber Exh. D, Ralph Decl. ¶¶ 1-11. This retailer called Weber to complain that Weber was making grills for Sears—a competitor—but not for him. *Id.*

A reasonable jury could even find that Sears intentionally copied Weber's design in order to sow confusion. When Sears redesigned its Kenmore Elite series, Sears used Weber's design—and no other competitors'—as a model. R. 288-2, Weber Exh. B., Kobrick Dep. at 194:5-19; R. 288-7, Weber Exh. G, Hu Email; R. 288-8, Weber Exh. H, Fillion/Dykes Emails. Christopher Kobrick, Sears's Product Manager for Kenmore Gas Grills, even called the allegedly infringing grill, in the context of trying to ascertain the details of Weber design, the "Weber Killer." R. 288-10, Weber Exh. J, Weber Killer Email ("Do you have bigger, clearer renderings of the Weber Killer grills you are working on?"). Kobrick's team even obtained a Weber Genesis grill to use as a model. Kobrick Dep. at 169:6-13.

Sears copied, in detail, many aspects of the Weber Genesis's look, including the trade dress elements at issue in this case. Sears copied the rivets on the grill's hood. Am. Compl. ¶ 58 (photographs). When the Sears grill was released, it and the Weber Genesis grills were the only two gas grills that "use[d] rivets on the left and right side trip pieces" of the hood. Kobrick Dep. at 184:19-185:5; Kempster Decl. ¶ 22. Sears also copied the placement of the product name. Kobrick Dep. at 190:2-17 (from a Sears email: "The name would sit on the console much like Genesis and Spirit do on Weber grills."); R. 288-13, Weber Exh. M, Name Placement Emails. Sears even went from four screws to two on the new grill's "tank gauge" because that was what Weber had. R. 288-9, Weber Exh. I, Hu/Kobrick Emails.[3]

The result was a visual similarity between the Weber Genesis grills and their accused Kenmore counterparts that a reasonable jury could find to be substantial:



Weber Genesis® S310



Kenmore Elite Stainless Grill



Weber Genesis® S330



Kenmore Elite Espresso Grill

---

[3]Sears tried to copy Weber's ceramic ignition switch covers but apparently could not find a supplier. R. 288-11, Weber Exh. K, Ignition Switch Emails.

Am. Compl. ¶ 58.

There is a final piece of evidence that the purpose of Sears's copying was to pass off the Kenmore grills as Weber-made. Once again, it comes from Sears Product Manager Kobrick, who put it this way: "[Sears has] developed a model to directly compete with Weber's best-selling model, the 699 Weber Genesis. We spec'd the features exactly the same, improved the materials and construction and created a grill that the fit, feel and finish will make the customer think of the market share leader, Weber, but at a lower price." Kobrick Dep. at 89:8-21, 94:8-16; Weber Exh. E, Kobrick/Ostrom Emails.

### D. Weber Sues

Following the release of the Kenmore grills, Weber sued Sears for trade dress infringement. Am. Compl. ¶¶ 55-74. Weber alleges that Sears designed its Kenmore Elite 500, 550, 600, and 700 Series Gas Grills to intentionally "create the same overall visual effect and appearance as the family of grills in Weber's Genesis Line," and more specifically, that doing so infringed on the four trade-dress elements listed above. *Id.* ¶¶ 57, 70. Sears moved for summary judgment on this claim. R. 199, Mot. Summ. J. But Weber asked for time to complete expert discovery, R. 205, Rule 56(d) Mot., which the Court granted, terminating Sears's first motion without prejudice, R. 210. Following expert discovery, Sears filed a renewed motion. R. 264, Renewed Mot. Summ. J. That motion targeted the "secondary meaning" element of Weber's trade dress claim. Secondary Meaning Op. at 1. The motion was denied because the Court found that "[r]elying on the proffered evidence, a reasonable jury could

conclude that Weber's trade dress acquired secondary meaning." *Id.* at 11. Now Sears has moved for summary judgment again, this time targeting the likelihood-of-confusion element of Weber's trade dress claim. R. 338, Sears's Mot.

### III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## IV. Analysis

## A. Michael Kempster

Summary judgment is about determining whether the evidence justifies a trial. To do that, the Court must first decide what counts as evidence. To remove a piece of evidence from consideration on summary judgment "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence [at trial]." Fed. R. Civ. P. 56(c)(2). Here, Sears objects to the opinion evidence offered by Michael J. Kempster, arguing that it is inadmissible under Rule 702 of the Federal Rules of Evidence. R. 409, Sears's Reply Br. at 12-14.

Kempster is Weber's expert on likelihood of confusion. R. 363-3, Kempster Rep. at 1 ("Expert Report of Michael J. Kempster on Trade Dress Infringement"). Kempster is also a Weber employee. He has been with Weber for 43 years and is now its Chief Marketing Officer and a member of its board of directors. *Id.* Based on an analysis of the likelihood-of-confusion factors, he opines that "there is a strong likelihood that consumers will be confused into believing that the Kenmore Elite product is sourced by, sponsored by or affiliated with Weber because of the similarities in appearance." *Id.*

Sears's argues that these opinions[4] must be excluded for three reasons. R. 409, Sears's Reply Br. at 12-14. Only one need be discussed. Sears argues that Kempster's opinions are inadmissible because Kempster did not explain how his

---

[4]Sears only objects to Kempster's opinion testimony, not "to Mr. Kempster providing factual testimony for which he has personal knowledge … ." R. 409, Sears's Trade Dress Reply Br. at 13 n.3.

experience led him to the conclusions. *Id*. at 14. The Court agrees. When an expert witness "is relying solely or primarily on experience," as Kempster is, "then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, 2000 Advisory Comm. Note; *see also S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 810-11 (11th Cir. 2015) (affirming exclusion of expert testimony where expert failed to explain how his experience led to his conclusions). Kempster has not done so. On how his experience guided him to his conclusions, his report and deposition are silent. Weber, in its briefing, never claims otherwise. *See* R. 416, Weber's Sur-Reply on Kempster. The opinions are therefore inadmissible.

This ruling only applies to summary judgment. Come trial, Sears may file a motion *in limine* targeting Kempster's opinions with these same arguments. The Court will likely grant the motion unless Weber can point to something in the record that explains how Kempster's experience drove his conclusions. (That something must, of course, have been properly disclosed under Rules 26 and 37 of the Federal Rules of Civil Procedure.)

## B. Likelihood of Confusion

Weber's trade dress claim is based on § 43(a) of the Lanham Act. That provision makes "liable in a civil action" "[a]ny person who, on or in connection with any goods or services … uses in commerce any … symbol, or device, or any combination thereof … which … is likely to cause confusion … as to the affiliation,

connection, or association of such person with another person … ." 15 U.S.C. § 1125(a)(1)(A). This text prohibits infringement of trade dress (even if it is not registered with the Trademark Office). *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28-29 (2001). To make a case for trade-dress infringement, the plaintiff must show that the allegedly infringed trade dress is non-functional, 15 U.S.C. § 1125(a)(3); "that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products," *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998) ("*Betts II*"); and, if the trade dress claim is based on the product's design (like Weber's is), that the trade dress has acquired secondary meaning, *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 213 (2000).

This summary judgment motion turns on the second element—likelihood of confusion.[5] R. 339, Sears's Br. at 1. Seven factors bear on the analysis: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, 2013 WL 6839815, at *3-4 (N.D. Ill. Dec. 27, 2013) (citing *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929

---

[5]Sears's reply brief makes an argument about the first element—functionality. R. 409, Sears's Reply Br. at 9 ("That is a fatal admission of Aesthetic Functionality, and conclusively defeats Weber's claim … ."). But a litigant is not permitted to make arguments for the first time in a reply brief, because it is unfair to the nonmoving party, who has no chance to respond. *See United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008) ("Arguments may not be raised for the first time in a reply brief; this submission therefore is waived.").

(7th Cir. 2008)). "[U]sually the similarity of the marks, the defendant's intent, and actual confusion are particularly important." *AutoZone*, 543 F.3d at 929. But "[c]ourts may assign varying weight to each of the factors depending on the facts presented." *Id*. at 929. And the Seventh Circuit has long held that summary judgment motions aimed at likelihood of confusion "must be approached with great caution." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993).

Here, that caution—and substantial evidence, as discussed below—require the denial of Sears's motion. A reasonable jury could rely on the "particularly important" factors of similarity, intent, and actual confusion as well as the strength factor to conclude that Sears's use of Weber's trade dress causes a likelihood of confusion. The Court will discuss each factor before turning to Sears's counterarguments.

### 1. Similarity

The inquiry on this factor is whether, in light of the similarity between Weber's trade dress and the accused grills, a "consumer would believe that the [Weber] sponsored, endorsed or was otherwise affiliated with" the accused grills. *AutoZone*, 543 F.3d at 930 (quoting *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228-29 (7th Cir. 1993)). Just the pictures are enough to show that a reasonable jury could draw that conclusion here:



**Weber Genesis® S310**



**Kenmore Elite Stainless Grill**

**Weber Genesis® S330**



**Kenmore Elite Espresso Grill**

Am. Compl. ¶ 58. The similarities include all four trade dress elements: "(1) metal bands bordering the edges of the grill shroud with exposed rivets/fasteners; (2) shiny door edges on the grill cart; (3) shiny horizontal tubular handles for the door and lid handles; and (4) product logo in the lower right corner of the side table." R. 138, Am. Compl. ¶ 70.

In addition to the jurors themselves making a visual comparison between the grills, there is evidence that a key Sears executive himself believed that the grills are similar. As noted above, Sears's Product Manager for Kenmore grills, Christopher Kobrick, admitted: "Quite frankly, we … created a grill that the fit, feel and finish will make the customer think of market share leader Weber … ." R. 363-5, 7/27/12 Kobrick Email.

Sears's argument on the similarity factor—that "a grill is a grill"—is unpersuasive. Sears's Reply Br. at 7-8. To be sure, Sears is right that the degree of similarity must be judged in context—both devices are grills, and therefore some

13

grill features are very likely to appear in all grills. But Sears does not validly apply that principle to the facts of this case. Here, the trade dress elements do not have an appearance that are, so far as the record reveals, common to all (or almost all) grills. Simply because a grill is a grill does not mean that it must have its brand name stuck on the lower-right corner of the right-hand side table, exposed rivets, shiny tubular handles running across the shroud and doors, and shiny grill-cart door edges. A reasonable jury could conclude that it is more the trade-dress appearance of those features, and less merely being grills, that drives the products' similarity.

### 2. Intent to Pass-Off

Turning to Sears's intent, again a reasonable jury could readily find this factor to be heavily in Weber's favor. "[P]roof of intent is a 'particularly important' factor in the likelihood-of-confusion analysis." *Am. Eagle Outfitters*, 2013 WL 6839815, at *8 (quoting *AutoZone*, 543 F.3d at 929). In view of the statements of Sears executives and Sears's design process (which included the use of Weber's grill as a model), the Court has already determined that the evidence supports a reasonable inference that "Sears copied Weber's trade dress with an eye toward passing off its grills as Weber's." Secondary Meaning Op. at 11 (summarizing evidence). This goes a long way toward defeating Sears's motion.

Sears's contrary arguments are again unpersuasive. First, Sears argues that it cannot have intended to pass off its grills as Weber's because it had no "notice" that Sears was claiming any rights in its trade dress. Sears's Reply Br. at 10-11.

This misses the point. Whether Sears's knew Weber claimed the trade dress or not, Sears appears to have intentionally appropriated it for its grills and—based largely on Sears's own internal communications—a reasonably jury could conclude that it did so with the intent to make customers think its grills had something to do with Weber's.

Next, Sears argues that there is a difference between copying and copying with the intent to cause confusion. *Id*. at 11. No doubt this is so. But Sears does not explain why the evidence must be interpreted as falling on the copying-only side of the line—Sears just says that the line is there. As discussed above, the evidence here is more than enough to allow a reasonable jury to infer that Sears crossed the line and intended to cause confusion. *See* Secondary Meaning Op. at 11.

### 3. Actual Confusion

Moving on to the next factor, there is evidence of actual confusion, which is (not surprisingly) a particularly valuable consideration in analyzing the likelihood of confusion. "The fact that there is any evidence of actual confusion at all is [] 'entitled to substantial weight in the likelihood of confusion analysis.'" *Am. Eagle Outfitters*, 2013 WL 6839815, at *8 (quoting *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001)). This is, in part, because "evidence of actual confusion is 'almost impossible to secure' because 'confusion often go[es] unreported or unrecorded' and because '[p]ersons who are truly confused will often never be aware of the deception.'" *Am. Eagle Outfitters*, 2013 WL 6839815, at *8 (quoting McCarthy on Trademarks § 23:12). For these reasons, the Seventh Circuit has deemed "[o]ne

instance of actual confusion … sufficient to weigh in favor of finding a likelihood of confusion." *CAE,* 267 F.3d at 686.[6]

Here, Weber has evidence of actual confusion (though not as much as it thinks), which is entitled to substantial weight. First, Grant West, a consumer, says that he was "on a search to find a new grill, … inten[ded] to purchase a Weber Genesis grill, … [and then] heard that Weber made grills for Sears called Kenmore Elite." R. 363-1, West Decl. ¶¶ 3-4. When West asked a Sears sales associate whether Weber made the Kenmore Elite grills, the associate mistakenly told him that "'yes' the Kenmore Elite was a private label Weber product.'" *Id.* So, "because the products looked the same," West bought the Kenmore, "believing that the Kenmore elite product I bought was actually manufactured by Weber." *Id.* ¶¶ 5-7. West only learned that his Kenmore was not a Weber when contacted by Weber's lawyers. *Id.* ¶ 10. The lawyers found West on a website where West had posted an online product-review repeating his mistaken belief that Weber manufactured his Kenmore Elite grill. *Id.*

West's declaration is not dispositive actual-confusion evidence, but it is admissible (when presented as direct testimony at trial) and relevant evidence. It is imperfect because West was told that Weber made the Kenmore Elite grills. So we

---

[6]*CAE* was referring to *Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 867 (7th Cir. 1983), which was not a summary judgment case. Rather, it affirmed the grant of preliminary injunction to a trademark plaintiff, finding no abuse of discretion in the district court's determination that the plaintiff had shown a likelihood of success on likelihood of confusion because of, among other evidence, one instance of actual confusion. *Id.* This is not the same as the Seventh Circuit holding that *one* instance of actual confusion alone would be sufficient to deny summary judgment, but the decision did depend significantly on that evidence. The Court has accordingly given *Wesley* (and Weber's evidence) the appropriate weight.

will never know whether he would have thought the visual similarities were so striking *on their own* that he would have reached the same conclusion. Nonetheless, the declaration makes it clear that West's confusion about the source of his grill was due, at least in part, to the visual similarities between the products. *Id*. ¶¶ 5-7. On summary judgment, with Weber entitled to reasonable inferences, that is enough to tip this factor in Weber's favor. A reasonable jury could infer, for example, that had the grills looked different, West might not have believed what he was told. Also, Weber—again, on summary judgment—may benefit from the inference that the people who told West that Weber was making the Kenmore Elites were confused by appearance. With the similarity so striking and no other ready explanation for the confusion, a reasonable juror could infer that whomever told West was confused because Sears infringed on Weber's trade dress.[7]

As mentioned earlier, Weber also has a declaration on actual confusion from a retailer. David Ralph owns a True Value Hardware store that sells Weber grills. R. 363-2, Ralph Decl. ¶¶ 2-4. Ralph saw a print ad for Kenmore Elite grills and thought, due to their appearance, that they were made by Weber. R. 363-2, Ralph Decl. ¶¶ 5-9. Ralph was so concerned about the notion of Weber making private label grills for Sears—a competitor of his—that he called his contact at Weber to complain. R. 363-2, Ralph Decl. ¶ 10. To be sure, Ralph is not a consumer. But, as the Court already discussed in the earlier opinion, this goes to weight, not

_____

[7]As explained in *American Eagle*, West's statements about what the unidentified person and the sales associate told him are not hearsay. 2013 WL 6839815 at *7 (rejecting hearsay objection because statements were not offered for the truth of the matter asserted and, even if they were, would fall under exception for states of mind).

admissibility. R. 419, Secondary Meaning Op. at 11, n.4. For some products, the difference between a consumer and a retailer might render the confusion of one group irrelevant to the question of whether the other is also confused. But not here. That Ralph may have more experience with the grill market than the average consumer is not a reason to discount his evidence entirely; it is merely a factor Sears can probe at trial. Indeed, a reasonable jury might conclude the opposite: that a retailer who is in the business of selling different types of grills would pay more attention to the trade dress, and be *less* likely to be confused, so the fact that Ralph was confused is even better evidence than a consumer's confusion.

Weber's next piece of actual confusion evidence comes from another Sears executive. Tom Ruggles, a Sears "Sales Development Manager," wrote in an email that he "canvassed top grill sales associates for feedback" and, among many other things, he wrote that he heard that "Kenmore Elite" "[l]ooks good! People think it's the Weber Genesis." R. 363-5, 6/23/13 Ruggles Email. This evidence is admissible. On foundation, Weber likely can lay adequate foundation for its admissibility at trial (given the author and its business-record nature). Fed. R. Civ. P. 56(c)(2). On authenticity, Sears does not contest the email's authenticity. Any potential hearsay problem is likely satisfied by the party-admissions exemption under Rule 801(d)(2)(D), because Ruggles wrote the email and the underlying statements are from Sears's "top grill sales associates." The statements consumers made to the sales associates, that is, whatever the consumers said to the associates to make the associates report to Ruggles that "People think it's the Weber Genesis," are

nonhearsay because they are not offered for their truth (they are offered to show confusion, not that the Kenmore really is a Weber Genesis) or, even if they were, they would be admissible under the exception for statements on the declarant's state of mind. *American Eagle*, 2013 WL 6839815 at *7.

Moving beyond admissibility, Sears challenges the Ruggles evidence because "Weber [did not] identify its author as a witness [in its Rule 26 disclosures]… much less seek to depose him" and because the email does not say that the confusion was caused by Sears's use of Weber's trade dress. Sears's Reply Br. at 5. There is no rule that would require Weber to prove up the Ruggles email and evidence by calling Ruggles himself. It is likely that Weber could use any number of Sears executives who had personal knowledge of Ruggles's job and his duties, and as noted above, sufficient foundation can be presented to allow the email into evidence. So Weber's decision not to list Ruggles as a witness is no barrier to admissibility. And on summary judgment, Weber is entitled to the reasonable inference that the confusion—"People think it's the Weber genesis"—is based on the visual similarity between the grills, especially because the email refers to the "looks" of the grill in the same breath as the confusion.

Unlike the Ruggles email, Weber's last piece of purported confusion evidence does have an admissibility problem. As noted above, Weber's Chief Marketing Officer is Michael Kempster. Kempster declares that he is "*aware* of numerous instances of actual confusion in the marketplace, including consumers mistakenly calling into Weber's customer service lines asking about the Kenmore-Elite

product." R. 363-6, Kempster Decl. ¶ 24 (emphasis added). Without knowing how Kempster became "aware" of the examples of actual confusion, there is insufficient foundation for this testimony. Although a customer-service representative may testify to what he or she heard a confused consumer say, *American Eagle*, 2013 WL 6839815 at *7, Kempster does not say that he himself heard the consumers, so on this record, he has no personal knowledge of the instances of confusion. And Kempster does not otherwise explain how he learned of the instances, so there might very well be a layer of inadmissible hearsay in the proposed testimony. This evidence is disregarded.

In sum, however, the evidence that *is* admissible is more than enough for a jury to find that the actual-confusion element favors Weber. Indeed, given the difficulty of securing evidence of actual confusion, and its corresponding weight in the likelihood of confusion analysis, this goes a long way toward defeating Sears's motion. Sears's counterargument—a repeat from its secondary meaning motion—is a non-starter. Sears says that the market for grills is so large that, if confusion was likely, there would be lots of incidents. Because Weber found only a few, Sears argues, the Court should infer that confusion is not likely. Sears's Reply Br. at 6. As the Court noted last time, Secondary Meaning Op. at 16, the Court cannot, on summary judgment, draw inferences like this against Weber. *Anderson*, 477 U.S. at 255.

### 4. Strength

Turning to strength-of-mark (or, in this case, strength-of-trade-dress), a reasonable juror could easily conclude that Weber's trade dress is "strong" in the relevant sense. "The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE*, 267 F.3d at 684. By denying summary judgment as to secondary meaning, the Court has already found that Weber's trade dress has at least some strength. *E.g.*, *Munters Corp. v. Matsui Am., Inc.*, 730 F. Supp. 790, 797 (N.D. Ill. 1989) (referring to secondary meaning as "an evidentiary demonstration of recognition of the mark's strength"). And Weber gets the rest of the way there by relying—as it did on the secondary meaning motion—on its advertising and sales involving the trade dress. *See* Secondary Meaning Op. at 2, 4-5.

After all, "[t]he strength of a mark usually corresponds to its economic and marketing strength." *AutoZone*, 543 F.3d at 933 (concluding that mark in question had "plenty of … strength" due to display in "more than 3,000 stores [and] hundreds of millions of dollars' worth of advertising"); *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219 (7th Cir. 1978) ("[T]he trade-mark has the advantage of strength where its owner has invested a considerable amount in advertising or can point to a long period of time during which his mark was used on a great quantity of articles, as symbolic of his business.") (quoting Callman, *Unfair Competition and Trade-Marks* § 82.1 (2d ed.)). Here, Weber has undisputed evidence showing that it has spent millions advertising grills with the asserted trade dress. Kempster Decl. ¶¶

10-14 ("Weber also spent approximately … $79,000,000 … in advertising … grills with the Weber Trade Dress … ."). This strength—which a jury could rely on the advertising and sales evidence to find—is significant because "[t]he stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*, 543 F.3d at 933 (2 McCarthy § 11.73, at 11–169 to 170 (2008)). Sears's contrary arguments are the same as those rejected in the Secondary Meaning Order, and are rejected now for the same reasons. Sears's Reply Br. at 8-9 ("Weber Has No Rights").

### 5. Sears's Remaining Arguments

Sears's remaining arguments fit into two camps: appeals to authority that turns out to be distinguishable, and requests that the Court deviate from standard tenets of summary judgment practice. Turning first to Sears's cited cases, it relies on three decisions affirming summary judgment on likelihood of confusion grounds: *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 509 F.3d 380, 383 (7th Cir. 2007), *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996), and *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1155 (10th Cir. 2013). Each is distinguishable.

*Water Pik* is distinguishable because the plaintiff's mark was weak and there was little similarity. 726 F.3d at 1155 ("Given the weakness of the [] mark, the likelihood of confusion is small unless the challenged mark is very similar. … The requisite similarity is missing here."). This case is different. Weber's trade dress is strong and the similarity between it and Sears's grills is substantial (at least a jury

could reasonably so find). Sears also relies on *Water Pik* to attack Weber's actual confusion evidence. Sears's Reply Br. at 4 ("even if Weber's evidence were all Weber dresses it up to be, it would be *de minimis*") (citing *Water Pik*, 726 F.3d at 1150-51). But as explained above, in discussing similarity, Weber's evidence is far from *de minimis*. It might be appropriate to set aside actual-confusion evidence when the marks are dissimilar, like *Water Pik* did. But when the marks are nearly identical, then actual-confusion evidence strengthens the trade-dress owner's position.

Sears relies on *Door Systems* for the same anti-confusion point. Sears Br. at 2 (citing *Door Systems*, 83 F.3d at 173). But the case is distinguishable along the same lines as *Water Pik. Door Systems* relied on the clear dissimilarity in the marks to affirm, in spite of some confusion evidence, summary judgment: "[A] glance at the parties' ads … suffices … to show that the district court was right to hold, on the defendant's motion for summary judgment, that there is no reasonable likelihood that any significant number of consumers could mistake the defendant for the plaintiff." *Id*. at 173. All this means is that in cases with dissimilar marks, it may be appropriate to discount actual confusion. But this is not a case with dissimilar trade dress.

Finally, Sears cites *Top Tobacco*. The only evidence on likelihood of confusion in that case was two pictures, one of the plaintiff's label and one of the accused label. *Top Tobacco*, 509 F.3d at 383 ("But the pictures are all we have."). That alone distinguishes the case. Here, there is a significantly more evidence than just pictures. But there is another distinction between this case and *Top Tobacco*: again,

the marks in *Top Tobacco* were, in fact, dissimilar from one another. 509 F.3d at 383.

Sears's remaining arguments all, in effect, ask the Court to draw inferences[8] against Weber from the evidence, which the Court is barred from doing on summary judgment: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … ruling on a motion for summary judgment … . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## V. Conclusion

For the reasons discussed, Sears's motion for summary judgment based on likelihood of confusion, R. 338, is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 4, 2015

---

[8]Specifically, Sears wants the Court to draw impermissible inferences against Weber because Weber did not do a confusion survey; because Weber did not show Sears's survey results to Michael Kempster; because Weber never sought to register its trade dress; because of Weber's discovery strategy; and because Weber only found a few instances of actual confusion.